MURDOCK v HIGGINS

Docket No. 101976. Argued November 12, 1996 (Calendar No. 5). Decided
      March 4, 1997.

      Christopher Murdock, when fifteen years old, was ordered by the
         Kalamazoo County Juvenile Court to perform community service at
         the Kalamazoo County Department of Social Services Children's
         Corner. After completion of his community service, Murdock
         brought an action in the Kalamazoo Circuit Court against, inter
         alia, Mark Kelley, his supervisor at the department, and Charles
         Higgins, director of the Missaukee County Department of Social
         Services with whom Kelley had worked before transferring to the
         Kalamazoo DSS, alleging that Kelley had sexually assaulted him and
         that Higgins had performed his job in a grossly negligent manner
         by failing to properly investigate and supervise Kelley's activities
         and to disclose suspicions about him to the Kalamazoo DSS. The
         court, William G. Schma, J., entered judgment on a jury verdict
         against Kelley and Higgins. Higgins appealed, claiming that he had
         no duty to the plaintiff and that the trial court erred in instructing
         the jury on the Child Protection Law. The Court of Appeals, HOOD,
         P.J., and MARILYN KELLY and J. L. MARTLEW, JJ., reversed in an opin-
         ion per curiam (Docket No. 143235). The plaintiff appeals.

      In an opinion by Justice WEAVER, joined by Chief Justice MALLETT,
         and Justices BRICKLEY and RILEY, the Supreme Court held:

      Higgins owed no duty to the plaintiff on the basis of the facts
         presented because no special relationship existed between Higgins
         and the plaintiff or between Higgins and Kelley. The trial court
         erred in instructing the jury on the Child Protection Law because
         the statute, by definition, does not apply to the facts.

      1. Whether a duty exists to protect a person from reasonably
         foreseeable harm is a question of law to be determined by evaluat-
         ing the relationship of the parties, the foreseeability of the harm,
         the burden on the defendant, and the nature of the risk presented.
         Only after finding that a duty exists may the factfinder determine
         whether, in light of the particular facts of the case, there was a
         breach of duty. Generally, there is no duty to protect a person who
         is endangered by a third person's conduct unless there is a special
         relationship either between the defendant and the victim or the

defendant and the third party who caused the injury. A special relationship must be sufficiently strong to require a defendant to take action to benefit the injured party. In this case, Higgins had no special relationship with the plaintiff from which a duty could be imposed because Higgins had no knowledge of, communication or contact with, or control over the plaintiff.

2. While Higgins had an obligation not to hire or supervise DSS personnel in a grossly negligent manner, he did not owe such a duty to this plaintiff because, at the time of the assault, Higgins was not Kelley's supervisor and the Missaukee DSS was no longer Kelley's employer. Moreover, Higgins did not have a duty to protect the plaintiff from unreasonable harm because it was not foreseeable that the plaintiff was a person who was endangered or that Kelley would abuse his position with the DSS to assault the plaintiff.

3. It is error to instruct a jury about an issue unsustained by the evidence or the pleadings. In this case, the trial court instruction on the Child Protection Law served only to confuse the issues for the jury. The statutory definitions within the Child Protection Law clearly do not apply to Higgins under the facts of the case. He would have no duty to report if he had no information of a specific child abused by Kelley. Furthermore, Kelley's relationships with his park contacts were not the type addressed by law, i.e., Kelley was not responsible for the health or welfare of any of the persons with whom he had contact while in Missaukee. The Court of Appeals correctly reversed the trial court's instruction on the Child Protection Law.

Justice BOYLE, joined by Justice CAVANAGH, concurring, stated that the record does not support sustaining a cause of action against defendant Higgins. The defendant did not owe a duty to the plaintiff as a matter of law. The defendant had no contact with minors as coordinator of volunteer services at the Missaukee DSS, and the record does not raise a factual issue that he knew that Mr. Kelley's activities in the park involved contact with minors. Moreover, there was no disputed question of fact that the defendant knew that Mr. Kelley was being, or had been, transferred to a position in the Kalamazoo DSS in which he would come into contact with minors.

Affirmed.

Justice KELLY took no part in the decision of this case.

208 Mich App 210; 527 NW2d 1 (1994) affirmed.

*Silverman, Rodbard & Smith, P.C.* (by *Michael C. Bingen*), for the plaintiff.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Thomas R. Wheeker* and *Susan I. Leffler*, Assistant Attorneys General, for the defendant.

WEAVER, J. Plaintiff-appellant places three issues before this Court. First, whether the Court of Appeals erred when it held defendant Higgins owed no duty to protect this plaintiff from reasonably foreseeable harm on these facts; second, whether the Court of Appeals erred in holding that the trial court erroneously instructed the jury on Michigan's Child Protection Law, MCL 722.622; MSA 25.248(2); and, third, whether the Court of Appeals erred in finding that, as a matter of law, there was insufficient evidence to find that Higgins' conduct was the proximate cause of plaintiff's injuries.[1]

We affirm the decision of the Court of Appeals.[2] We hold that defendant Higgins owed no duty to plaintiff on the basis of these facts because no special relationship existed between Higgins and the plaintiff, or between Higgins and Kelley, the perpetrator. Further,

---

[1] Because we affirm the trial court's holding that defendant Higgins owed no duty to plaintiff on the basis of these facts, we do not need to address whether there was insufficient evidence to find that defendant Higgins' conduct proximately caused plaintiff's injuries.

Moreover, Higgins asserts that the public-duty doctrine, most recently addressed by this Court in *White v Beasley*, 453 Mich 308; 552 NW2d 1 (1996), shields him from liability. In the relevant part of *White v Beasley*, this Court upheld the public-duty doctrine, which acts as a defense once a duty is found, and held that, as applied to police officers, the doctrine shields defendant officers from liability for negligent nonfeasance, or failure to provide police protection, unless the plaintiff can establish that a special relationship existed between the officers and the plaintiff. Because we hold that defendant Higgins owed no duty at common law to this plaintiff, it is unnecessary to address whether Higgins has a valid defense in the public-duty doctrine.

[2] 208 Mich App 210; 527 NW2d 1 (1994).

we hold that the trial court erred in instructing the jury on Michigan's Child Protection Law because the statute, by definition, does not apply to these facts.

I

In the summer of 1987, Christopher Murdock, the plaintiff-appellant, was a fifteen-year-old volunteer at the Kalamazoo County Department of Social Services (hereinafter DSS) Children's Corner.[3] The Kalamazoo County Juvenile Court ordered plaintiff to perform 150 hours of community service and referred plaintiff to the Kalamazoo County DSS Office of Volunteer Services. Defendant Mark Kelley was plaintiff's supervisor at the Kalamazoo DSS and, eventually, befriended plaintiff. Defendant Kelley and plaintiff socialized with each other on their free time. On July 18, 1987, to celebrate the completion of plaintiff's volunteer work, Kelley took plaintiff out to dinner. After dinner the two returned to Kelley's home where they smoked Kelley's marijuana. At that time, Kelley attempted to engage in sexual activities with plaintiff. Plaintiff, allegedly in an attempt to escape Kelley's home, suggested that the two of them go to the hot tubs. Kelley took a bag containing soap, condoms, and lubricant.

Plaintiff fled from Kelley upon arriving at the hot tubs. At 1:00 A.M., plaintiff arrived at a friend's house nearby and told the friend and that friend's mother what had just occurred. The police were called and Kelley was arrested.

The DSS instituted an investigation of Kelley's behavior. Their internal investigation revealed that

---

[3] We note that the Court of Appeals incorrectly stated that plaintiff was eighteen years of age at the time Kelley assaulted him. *Id.*, n 2 *supra* at 212.

Kelley had in fact provided plaintiff, a minor of fifteen years, with marijuana and had sexually assaulted him. On the basis of Kelley's conduct, the DSS subsequently terminated Kelley.

Before working at the Kalamazoo DSS, Kelley worked at the Missaukee DSS. Defendant Charles Higgins, the director of the Missaukee County Department of Social Services, supervised Kelley while he worked with the Missaukee DSS. Higgins had hired Kelley about July 29, 1985, to coordinate volunteer services in Missaukee County. At trial, Higgins testified that he reviewed Kelley's résumé and checked some references before deciding to hire Kelley, but he admitted that he failed to check Kelley's last place of employment.[4]

Testimony revealed that in August 1986, approximately one year after Higgins hired Kelley, another employee told Higgins that Kelley had been seen at a local park talking to teenage boys and taking them "for a ride." Higgins testified that the alleged behavior raised minor concerns,[5] and that he decided to discuss the allegations with Kelley.

---

[4] Had Higgins investigated this matter, he would have found that Kelley was forced to resign as an assistant minister of a small church in Delhi, Michigan, because of allegations that he had homosexual relations with, and sexually assaulted, a minor. These charges were dismissed, however, when it was discovered that the young man involved was not in fact a minor, but was sixteen years old and had, therefore, reached the age of consent.

[5] Higgins' concerns were expressed in his personal notes as follows:

Received word from an interested person that an employee— Mark Kelley was spending a great deal of time driving in & out of the County Park & talking with young boys—on occasion picking them up & taking them for a ride.

This is of concern as Mark is known as being "Gay" by most all that know him.

On August 7, 1986, Higgins conducted the first of several meetings with Kelley regarding this alleged behavior, after and of which Higgins made brief notes. Higgins' notes of this first meeting indicated that Kelley did not deny the "activity other than he ha[d] not picked up any males 'under age 18.'" Higgins' notes further read:

> Suggested he consider resignation—if his activities became a problem, I would suspend/fire him as his position in the Dept. & the Dept's function in the community could not tolerate this kind of activity/P.A. [sic]. Advised him to be extremely careful/discreet in his actions.

Higgins' testimony and notes show that on the morning of August 8 he discussed the matter with the local sheriff and with Deputy Brooks. He discovered that no complaints about Kelley's activity in the park had been filed or reported, but that the "park ranger has noticed Mark in the park on many occasions talking with young boys & taking them for rides."

According to Higgins' notes, later that day the sheriff's department questioned Kelley. Kelley, in turn, discussed the sheriff department's inquiries and warnings with Higgins, and Kelley told Higgins he would stay out of the park. Higgins testified that at that meeting he again warned Kelley that if a "problem" developed, Higgins would take "swift" action.

On August 11, 1986, Kelley called Higgins and said that he was upset that someone was spreading rumors about him. Kelley again assured Higgins that he would be more discreet.

Finally, on August 20, Higgins told Kelley that he was "not totally sure that all [of his] contacts are over

18." Kelley told Higgins that he would have to leave town if he had "the urge to carry on."

On November 7, 1986, Kelley transferred to the Kalamazoo Department of Social Services. On October 22, 1986, Higgins signed an "Employee Departure Report" to effectuate Kelley's transfer to Kalamazoo. Higgins testified that when he learned of the transfer, he tried to telephone the director of the Kalamazoo County DSS, Vern Robert, to no avail. He did not follow-up with another telephone or a written inquiry, nor did he express his concerns about Kelley to the Kalamazoo DSS or to the Bureau of Labor Relations in Lansing. Higgins testified that he believed he could not report Kelley to the Lansing bureau without first receiving a formal complaint.

In 1988, plaintiff filed the instant action against Kelley, the Kalamazoo DSS, Donna Jarvis, Kelley's DSS supervisor at the time of the incident, and Higgins, Kelley's previous supervisor in Missaukee.[6] A Kalamazoo Circuit Court jury found there was no cause of action against Donna Jarvis, but returned a verdict of approximately $120,000 against Kelley and Higgins. The jury found that Higgins was grossly negligent and that that was the proximate cause of plaintiff's injuries.

Higgins appealed and claimed that he had no duty to plaintiff, that the trial court erred in instructing the jury on Michigan's Child Protection Law, and that plaintiff had failed to prove that Higgins' conduct was the proximate cause of plaintiff's injuries.

---

[6] The three officials were charged with negligent hiring and supervision of Kelley. Through a series of amended complaints, only the three individual defendants remained.

The Court of Appeals reversed the jury's determination against Higgins in a published per curiam opinion.[7]

Plaintiff subsequently sought and we granted leave to appeal.

II

The first issue raised on appeal is whether the Court of Appeals erred when it held that Higgins owed no duty to plaintiff on the basis of these facts. Plaintiff alleged that defendant Higgins performed his job as DSS supervisor in a grossly negligent manner under MCL 691.1407(2)(c); MSA 3.996(107)(2)(c)[8] because he failed to properly investigate and supervise Kelley's activities in Missaukee County or failed to disclose his suspicions about Kelley to the Kalamazoo County DSS officials.

The threshold question, whether a duty exists, is a question of law, an issue "solely for the court to decide . . . ."[9] In determining whether to impose a duty, this Court evaluates factors such as: the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented. *Buczkowski v McKay*, 441 Mich 96, 100; 490 NW2d 330 (1992). Only after finding that a duty exists may the factfinder determine whether, in light of the particular facts of the case, there was a breach of the duty.

---

[7] N 2 *supra.*

[8] Pursuant to MCL 691.1407(2)(c); MSA 3.996(107)(2)(c), plaintiff must prove that defendant engaged in conduct so reckless as to demonstrate a substantial lack of concern for whether injury results from that conduct.

[9] *Moning v Alfono*, 400 Mich 425, 437; 254 NW2d 759 (1977). See also *Lorencz v Ford Motor Co*, 439 Mich 370; 483 NW2d 844 (1992), and *Friedman v Dozorc*, 412 Mich 1, 22; 312 NW2d 585 (1981).

A

Generally, an individual has no duty to protect another who is endangered by a third person's conduct.[10] Where there is a duty to protect an individual from a harm by a third person, that duty to exercise reasonable care arises from a "special relationship" either between the defendant and the victim, or the defendant and the third party who caused the injury. *Marcelletti v Bathani*, 198 Mich App 655, 664; 500 NW2d 124 (1993). Such a special relationship must be sufficiently strong to require a defendant to take action to benefit the injured party. *Samson v Saginaw Professional Bldg, Inc*, 393 Mich 393, 406; 224 NW2d 843 (1975).

In this case, a special relationship would exist if the plaintiff had entrusted himself to the protection and control of defendant Higgins and, in so doing, lost the ability to protect himself. *Dykema v Gus Macker*, 196 Mich App 6, 9; 492 NW2d 472 (1992), citing *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495, 499; 418 NW2d 381 (1988). During his volunteer work with the Kalamazoo DSS, plaintiff arguably entrusted himself to the control of the Kalamazoo DSS. However, this plaintiff had no such trust relationship with defendant Higgins. The two never made each other's acquaintance, and never spoke or otherwise communicated. Higgins, as the supervisor of Missaukee DSS personnel, had no contact with or control over Kalamazoo personnel or volunteers. In short, defendant Higgins had no duty to

---

[10] *Marcelletti v Bathani*, 198 Mich App 655, 664; 500 NW2d 124 (1993). See also *Buczkowski v McKay, supra,* and *Williams v Cunningham Drug Stores, Inc*, 429 Mich 495; 418 NW2d 381 (1988).

this plaintiff on the basis of a "special relationship" between himself and plaintiff because he had no knowledge of or communication with plaintiff.

Unlike cases in which this Court has recognized a special relationship between a plaintiff and a defendant,[11] this plaintiff never surrendered control of himself to Higgins. Rather, this plaintiff was assaulted by Kelley during a voluntary social outing that occurred after the conclusion of plaintiff's volunteer work with the Kalamazoo DSS. Neither Higgins nor the DSS had control over plaintiff outside his work with Children's Corner. Therefore, we find that defendant Higgins had no "special relationship" with plaintiff from which a duty could be imposed because Higgins had no knowledge of, contact with, or control over plaintiff.

B

While we find that a special relationship did not exist between plaintiff and Higgins, Higgins could still owe this plaintiff a duty not to hire or supervise DSS personnel in a grossly negligent manner should a special relationship be found to exist between Higgins and Kelley, the perpetrator. The employment relation-

---

[11] In *Williams v Cunningham Drug Stores, Inc, supra* at 498-499, this Court found that the owners of a drug store had a duty to protect the store's patrons from unreasonable risk of harm caused by a dangerous condition in or at the store. The duty was based on the invitor-invitee "special relationship." The Court, however, refused to extend this duty to require a merchant to provide armed, visible security guards to deter criminal acts of third parties. *Id.* at 501.

Some other generally recognized "special relationships" include the common carrier-passenger, innkeeper-guest, landlord-tenant, employer-employee, and doctor-patient/psychiatrist-patient. *Id.* at 499. See also *Moning*, n 9 *supra* at 438-439, *Preston v Sleziak*, 383 Mich 442, 450; 175 NW2d 759 (1970), *Romeo v Van Otterloo*, 117 Mich App 333, 341-343; 323 NW2d 693 (1982), and *Duvall v Goldin*, 139 Mich App 342; 362 NW2d 275 (1984).

ship can form the basis for such a special relationship that would impose a duty and may impose liability on Higgins.[12]

On the basis of this relationship, plaintiff claims that Higgins owed a duty to not be grossly negligent in the hiring and supervision of Missaukee DSS employees. While Higgins does have such an obligation, we find that he did not owe such a duty to this plaintiff. Plaintiff was injured by a Kalamazoo DSS employee, under the supervision of Donna Jarvis. Higgins' supervision of Kelley concluded when Kelley transferred to Kalamazoo, approximately one year before Kelley assaulted plaintiff. Higgins did not owe plaintiff a duty to hire and supervise Kelley in a non-grossly negligent manner because, at the time of the assault, Higgins was not Kelley's supervisor and the Missaukee DSS was no longer Kelley's employer.

Plaintiff also claims that Higgins breached his duty to disclose Kelley's dangerous propensities respecting minors to the Kalamazoo DSS. Plaintiff's claim is based on Michigan common law recognizing a qualified privilege that allows former employers to disclose dangerous actions or violent tendencies of past employees to prospective employers without being subject to claims of libel or slander.[13] This common-law qualified privilege has not, however, evolved into an affirmative duty to inform on the part of a prior employer. As stated in *Moore v St Joseph Nursing*

---

[12] See *Bradley v Stevens*, 329 Mich 556; 46 NW2d 382 (1951), *Hersh v Kentfield Builders, Inc*, 385 Mich 410; 189 NW2d 286 (1971), and *Romeo v Van Otterloo*, n 11 *supra* at 341-343.

[13] *Moore v St Joseph Nursing Home, Inc*, 184 Mich App 766; 459 NW2d 100 (1990). See also *Carroll v Owen*, 178 Mich 551; 146 NW 168 (1914).

*Home, Inc,* 184 Mich App 766, 768-769; 459 NW2d 100 (1990):

> We agree that Michigan law recognizes an employer's qualified privilege to divulge information about a former employee to a prospective employer. *There is, however, nothing about the conditional privilege which magically transposes it into a legal obligation requiring employers to disclose adverse information concerning a former employee. Rather, it is quite clear that in Michigan a former employer's duty to release information about a past employee is an imperfect obligation of a moral or social character.* [Emphasis added; citations omitted.]

The Court of Appeals continuation of this analysis aptly addresses two additional concerns, the burden on the defendant and the nature of the risk presented, that this Court often evaluates when deciding whether or not a particular defendant owes an individual plaintiff a duty.

> There is a great societal interest in insuring that employment records are kept confidential. It is all too easy to envision a career destroyed by malefic information released by a disgruntled former employer. To expand the qualified privilege presently enjoyed by employers to require the release of deleterious information without fear of a defamation suit represents a major change in the law. We note that, at present, Michigan has no less than nine statutory provisions addressing libel and slander. In light of this clearly demonstrated legislative intent to regulate defamation law, we feel the position urged upon this Court by the plaintiffs is the type of substantive change in the law which is best left to the Legislature. [*Moore v St Joseph Nursing Home, supra* at 769 (emphasis added; citations omitted).]

Essentially, plaintiff asks this Court to create a duty to disclose for intradepartmental or intracompany transfers, although we have refused to impose a duty

for intercompany, or interdepartment, disclosures. Because we find that both intracompany and intercompany disclosures present the same concerns, we decline to create a new cause of action on the basis of the facts before this Court. The qualified privilege shields certain discretionary disclosures from liability for slander, but the privilege does not transform such discretionary disclosures into mandatory acts.[14]

C

Moreover, Higgins did not have a duty to protect plaintiff from unreasonable harm because plaintiff was not one of "those persons readily identifiable as foreseeably endangered." *Marcelletti, supra* at 665. First, Higgins had no idea that Kelley would have any professional contact with minors because Kelley's

---

[14] In so finding we would note that Michigan common law does not distinguish between intercompany and intracompany disclosure. Rather, where the qualified privilege applies, it shields the individual, who releases the information to a prospective employer or a different department with the same employer, from liability for libel, slander, or defamation where " 'the party communicating has an interest, or in reference to which he has a duty, to a person having a corresponding interest or duty.' " *Wynn v Cole*, 91 Mich App 517, 523, n 1; 284 NW2d 144 (1979) (regarding disclosures by prior employer) quoting *Bacon v Michigan Central R Co*, 66 Mich 166, 170; 33 NW 181 (1887). See also *Parks v Johnson*, 84 Mich App 162, 171; 269 NW2d 514 (1978) (involving disclosures about current employee).

Creating a duty to disclose would be particularly inappropriate in this case where the alleged park activity was never substantiated. In this case, defendant Higgins' testimony indicated that he did not disclose his suspicions regarding Kelley because they were just that—suspicions. The reported park activity was never confirmed. Kelley testified only that it was possible that some of the young men were minors. Furthermore, the sheriff had no filed complaints regarding Kelley's alleged activities in the park. Higgins' testimony indicated that he suspected that the park "activity" was sexual in nature, but that Kelley never confirmed this suspicion during their meetings, particularly with respect to the conduct, if any, that Kelley may have had with minors.

similar position with the Missaukee Dss did not require that Kelley work, or have any contact, with minors. While plaintiff claims Higgins should have contacted the Kalamazoo office to become informed regarding the requirements of Kelley's new position, plaintiff cannot show that Higgins was acting unreasonably in failing to become so informed.[15]

Even if Higgins knew Kelley would have some professional contact with minors, Higgins could not foresee that Kelley posed a threat to those with whom he worked, such as the plaintiff. The information Higgins received regarding Kelley's activities in the Missaukee park involved alleged conduct that occurred after work on Kelley's free time with young men whom Kelley met on his own. There is no evidence that these contacts were introduced to Kelley by virtue, or through the course, of Kelley's work, or their work, with the DSS.

Moreover, even though Kelley told Higgins that he was not sure all his contacts were of consenting age, Kelley never confirmed that he, in fact, had any contact with minors. Plaintiff was not a reasonably foreseeable victim of Kelley's alleged predation because Higgins had no indication that Kelley was uncontrollably attracted to minors. Rather, Kelley repeatedly assured Higgins that he would refrain from engaging in such behavior. When Higgins checked with the local sheriff he found no complaints or reports regarding Kelley's activities in the park. This would

---

[15] In fact, defendant Higgins testified that he unsuccessfully attempted to telephone Vern Robert, the director of Kalamazoo County Dss. Higgins further testified that he would have communicated his concerns about Kelley to Robert if he had a complaint or some other form of concrete evidence to substantiate Kelley's alleged inappropriate behavior.

indicate to Higgins that Kelley had no prior problems curtailing his behavior with minors, and that his behavior toward minors was controllable and appropriate.

On the basis of the above, we find that defendant Higgins could not foresee that Kelley would abuse his position with the DSS to assault plaintiff.

III

Although the following discussion regarding the trial court's Child Protection Law instruction is not necessary to dispose of this case, for clarification purposes we address the issue.[16]

The Court of Appeals found that the trial court erred in instructing the jury on Michigan's Child Protection Law. We agree. Under Michigan law, it is error to instruct a jury about an issue unsustained by the evidence or the pleadings. *Mills v White Castle Systems, Inc (After Remand)*, 199 Mich App 588, 591; 502 NW2d 331 (1992). However, there is no error requiring reversal if, on balance, the theories of the parties and the applicable law were adequately and fairly presented to the jury. *Williams v Coleman*, 194 Mich App 606, 623; 488 NW2d 464 (1992).

In this case, the trial judge's instruction on Michigan's Child Protection Law only served to confuse the issues for the jury. Plaintiff argues that the instruction was not erroneous because Higgins introduced the topic and solicited testimony, albeit indirectly, on the duty to report.[17] Regardless of who solicited testi-

---

[16] Michigan's Child Protection Law, at the relevant time, was codified at MCL 722.621 *et seq.*; MSA 25.248(1) *et seq.*

[17] Originally, plaintiff's fourth amended complaint did not allege that defendant Higgins failed to report suspected child abuse pursuant to

mony on the subject or first injected it into the case, Michigan law clearly provides that it is erroneous to instruct a jury on an issue unsustained by the evidence or the pleadings. *Mills v White Castle Systems, Inc (After Remand), supra* at 591. The statutory definitions within Michigan's Child Protection Law clearly do not apply to this defendant under the facts of this case.

At the time of the incident in question, the Child Protection Law required, in pertinent part, that:

> A . . . social worker, social work technician . . . who has reasonable cause to suspect child abuse or neglect shall make immediately, by telephone or otherwise, an oral report, or cause an oral report to be made, of the suspected child abuse or neglect to the department. [MCL 722.623(1); MSA 25.248(3)(1).]

Defendant Higgins, as a certified social worker, had a duty to make an oral report of suspected child abuse if he has "reasonable cause to suspect child abuse or neglect" as defined by MCL 722.623(1); MSA 25.248(3)(1).   MCL 722.622(c);   MSA 25.248(2)(c) defined "child abuse" as:

> harm or threatened harm to a child's health or welfare by a parent, legal guardian, or any other person responsible for

---

Michigan's Child Protection Law, MCL 722.621 *et seq.*; MSA 25.248(1) *et seq.*   At the close of proofs, pursuant to MCR 2.118(C)(1),   plaintiff amended the complaint to conform to the evidence presented regarding MCL 722.621;   MSA 25.248(1). The issue was injected initially by defendant Higgins' counsel.

Plaintiff called defendant Higgins to the stand as an adverse witness. During cross-examination, defense counsel asked defendant if Child Protective Services ever investigated Kelley. Plaintiff's counsel then, on redirect examination, raised the Child Protection Law and the duty to report to Protective Services. Most of the remaining time at trial was devoted to the statutory duty to report issue.

the child's health or welfare or by a teacher or teacher's aide which occurs through nonaccidental physical or mental injury; sexual abuse; sexual exploitation; or maltreatment.

At the time in question, this only applied to the "known abuse of a specific child [by] a person [who was] responsible for that child's health or welfare . . . ." 208 Mich App 210, 218; 527 NW2d 1 (1994).

We agree with the conclusion of the Court of Appeals in *Marcelletti v Bathani, supra* at 659, 661, when it said:

> [T]he Legislature intended that liability under the statute be limited to claims for damages by the identified abused child about whom no report was made . . . . Michigan's child abuse reporting statute creates a private right of action *only* in an identified abused child.

Therefore, under the statute, Higgins would have no duty to report if he had no information of any specific, individual child "abused" by Kelley. Indeed, in this case, Higgins did not know of a *specific* child that Kelley had abused. Kelley did not indicate that he knew the identity of any contacts he had that might have been minors and could not be sure that *any* of his contacts were minors. Moreover, Higgins had no knowledge that Kelley's contacts were of a sexual nature or involved acts that would otherwise constitute "abuse" under the statute.

Furthermore, Kelley's relationships with the park contacts were not the type addressed by the law. The Legislature limited the scope of the duty to report by the type of relationship between the suspected abuser

and the child who was allegedly abused. MCL 722.622(h); MSA 25.248(2)(h) defined a "[p]erson responsible for the child's health or welfare" as

> a parent, legal guardian, person 18 years of age or older who resides for any length of time in the same home in which the child resides, or an owner, operator, volunteer, or employee of . . . [a] licensed or unlicensed child care organization . . . [or] licensed or unlicensed adult foster care family home or adult foster care small group home . . . .

In this case, Kelley was not responsible for the health or welfare of any of the individuals with whom he allegedly had contacts while in Missaukee. The youths were not introduced to Kelley or exposed to Kelley through his work with the DSS, therefore, he had no professional responsibility for these individuals.

In sum, Higgins had no duty under Michigan's Child Protection Law, given the plain meaning of the statutory definitions, which serve as deliberate limits to the scope of the act. We, therefore, find that the Court of Appeals correctly reversed the trial court's instruction on the Child Protection Law.

IV

Accordingly, we affirm the decision of the Court of Appeals and hold that defendant Higgins owed no duty to plaintiff on these facts because no special relationship existed between defendant Higgins and Kelley, or between defendant Higgins and the plaintiff. Because we find that there was no duty owed by Higgins to this particular plaintiff there is no need to address the further questions whether Higgins' con-

duct was the proximate cause of Kelley's behavior and plaintiff's alleged injury.

We further affirm the decision of the Court of Appeals and hold that the trial court erroneously instructed the jury on Michigan's Child Protection Law.

MALLETT, C.J., and BRICKLEY and RILEY, JJ., concurred with WEAVER, J.

BOYLE, J. (*concurring*). I agree with the lead opinion that on the basis of these facts defendant Higgins did not owe a duty to this plaintiff as a matter of law. The record reflects that defendant Higgins had no contact with minors in his role as coordinator of volunteer services at the Missaukee DSS. Neither did defendant Higgins know, nor could it be established that he knew, that Mr. Kelley's activities in the Missaukee County Park involved contact with minors. Moreover, the record confirms that there was no disputed question of fact that defendant Higgins knew that Mark Kelley was being, or had been, transferred to a position in the Kalamazoo DSS in which Mr. Kelley would come into contact with minors. While the events that have transpired in this young man's life are tragic, the record does not support sustaining a cause of action against this defendant. For these reasons, I concur with the majority opinion.

CAVANAGH, J., concurred with BOYLE, J.

KELLY, J., took no part in the decision of this case.