*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* JAVEED I. SYED, L.M.S.W.

DEPARTMENT OF LICENSING AND
REGULATORY AFFAIRS,

        Petitioner-Appellee,

v

JAVEED I. SYED, L.M.S.W.,

        Respondent-Appellant.

UNPUBLISHED
January 7, 2021

No. 349533
LARA Bureau of Professional
Licensing
LC No. 18-013571

Before: STEPHENS, P.J., and SAWYER and BECKERING, JJ.

PER CURIAM.

Respondent, Javeed I. Syed, L.M.S.W., appeals as of right a final order issued by the Board of Social Work Disciplinary Subcommittee (DSC) within the Bureau of Professional Licensing of the Department of Licensing and Regulatory Affairs (LARA). The DSC concluded that respondent violated MCL 333.16221(a) (negligence or failure to exercise due care) and placed respondent on probation for one day to six months, contingent on the successful completion of certain continuing education requirements. We affirm.

## I. BACKGROUND

Respondent, a social worker, worked at the Detroit Receiving Hospital crisis center, a locked area serving psychiatric patients that is part of, but in a separate area adjacent to, the emergency room. It had one entrance from the emergency room and another from a walk-in area. Respondent's duties included conducting psychosocial evaluations of patients, assessing patients' immediate needs, and assisting patients with discharge. A mental health technician (MHT) first met with every patient who came into the walk-in area, checked every patient for weapons, and collected every patient's belongings. A nurse then saw each patient before respondent met with

-1-

the patient. Patients could be violent and agitated, and staff members were trained in crisis prevention intervention, which ranged from verbal de-escalation to physical restraint, to respond to violent patients who were acting out.

One evening while respondent was working, an MHT assaulted a patient, as seen in two minutes and 20 seconds of soundless security camera footage. The MHT was checking in the patient in an area where respondent was standing behind a desk, when the MHT suddenly punched the patient twice, causing the patient to fall to the floor. Respondent asked the nurse if he should call security when the MHT told respondent not to; the nurse did not respond. After the MHT walked away from the patient, the nurse checked on the patient. Respondent appeared to be speaking while pointing down toward the patient and the nurse. When the nurse was finished checking on the patient, the MHT returned to the patient lying on the ground, dragged the patient a few feet while trying to help the patient stand up, and let go of the patient's hand when he did not get up. The patient then stood up on his own and returned to the MHT to finish checking in. Respondent remained behind the desk during the entirety of the incident, sometimes watching the MHT and the patient interact and sometimes looking back at the computer at which he was working.

Kimberly Moner, the Director of Patient Care Services whose duties included managing the crisis center, watched the security footage the next morning and notified Jacqueline Frazier, the recipient rights representative who was the advocate for patient rights. Frazier investigated the incident at Moner's request. Frazier interviewed respondent and asked him why he did not intervene; he told her that he was afraid the MHT would retaliate against him. Moner also met with respondent and asked him why he did not intervene, call security, or push the panic button; respondent told her that he did not know how to react because he was in shock and that he was afraid that the MHT would come after him. Respondent, Moner, and Frazier all agreed that it was highly unusual for a staff member to attack a patient. At the administrative hearing, respondent testified that he talked to the MHT to calm him down and that he spoke to the patient in a reassuring manner. Respondent said that he believed the MHT might become violent with him, and that he sought to not antagonize the MHT, to keep the patient safe, and to avoid getting hurt himself. Respondent testified that he did not need to call security or push the panic button because the patient was not upset and the MHT was no longer angry, and calling security could have made the situation worse.

Petitioner filed an administrative complaint, alleging that respondent failed to intervene when an MHT hit a patient in the head twice, knocked him to the floor, and dragged him across the floor into a room. Petitioner alleged that respondent violated MCL 333.16221(a) and (b)(*i*), which allow for disciplinary action for the following reasons:

> (a) Except as otherwise specifically provided in this section, a violation of general duty, consisting of negligence or failure to exercise due care, including negligent delegation to or supervision of employees or other individuals, whether or not injury results, or any conduct, practice, or condition that impairs, or may impair, the ability to safely and skillfully engage in the practice of the health profession.

(b) Personal disqualifications, consisting of 1 or more of the following:

(*i*) Incompetence.

Siri Gottlieb, a licensed attorney and licensed social worker qualified to testify as an expert in social work, testified that respondent did not take appropriate action and did not appear to try to intervene. Gottlieb maintained that social workers have a duty to ensure patient safety or move a patient out of a dangerous situation as long as it is safe for the social worker to do so. Gottlieb testified that the sources of respondent's duty were his employment with the hospital and the Public Health Code, MCL 333.1101 *et seq*. Gottlieb stated that respondent's duty to the patient arose after the MHT hit the patient because it did not appear from the video that respondent could have prevented the technician from hitting the patient. Gottlieb testified that intervention could have taken several forms, including telling the technician to stop, trying to separate the technician and the patient if possible, calling security, leaving the area to get security, or pressing the panic button to summon security. Gottlieb did not see respondent attempt to intervene on the video but agreed that verbal de-escalation would have satisfied respondent's duty.

The Administrative Law Judge (ALJ) concluded that petitioner did not establish by a preponderance of the evidence that respondent's failure to intervene constituted negligence, in violation of MCL 333.16221(a), or incompetence, in violation of MCL 333.16221(b)(*i*), and recommended dismissal of the complaint. The ALJ determined that respondent owed a duty to the patient as a function of respondent's role as a hospital social worker who was on duty when the incident occurred, describing the duty as less than the duty owed by a healthcare provider actively treating a patient. The ALJ noted Gottlieb's testimony that respondent's duty to intervene arose after the physical assault and that he should have called security, pressed the panic button, spoken to or physically intervened with the technician, or told the technician to stop. The ALJ credited respondent's testimony that he verbally intervened successfully and that calling security could have exacerbated the situation when the MHT made it clear he did not want security to be involved. The ALJ concluded that it was not clear whether additional action would have helped or hindered the situation by escalating it. Having credited respondent's testimony, the ALJ rejected petitioner's claim that respondent did nothing in response to the assault. The ALJ concluded that respondent's actions met the standard of care.

The DSC accepted in part and rejected in part the ALJ's proposal for decision. The DSC concluded that petitioner established by a preponderance of the evidence that respondent violated a general duty, in violation of MCL 333.16221(a), but not that respondent was incompetent, in violation of MCL 333.16221(b)(*i*). The DSC concluded that respondent did not appear to intervene or attempt to protect the patient, even if his lips moved on the video. The DSC noted that respondent remained behind the desk as if nothing happened. The DSC rejected respondent's testimony that he calmed the technician and the patient and that he did not call security for fear of exacerbating the situation; it noted that this testimony was self-serving and inconsistent with his statements to Moner and Frazier that he did not intervene because he was afraid of the technician. The DSC also determined that respondent's testimony was inconsistent with the video showing that respondent failed to take meaningful action and resumed working as if nothing had happened.

## II. DISCUSSION

### A. RESPONDENT'S LEGAL DUTY

Respondent raises several challenges to the agency's determinations regarding respondent's duty to the patient. "Rulings by disciplinary subcommittees of regulated professionals are reviewed on appeal solely under Const 1963, art 6, § 28." *Bureau of Prof Licensing v Butler*, 322 Mich App 460, 464; 915 NW2d 734 (2017). Judicial review of administrative decisions "shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record." Const 1963, art 6, § 28.

MCL 333.16221(a) authorizes disciplinary action for "a violation of general duty, consisting of negligence or failure to exercise due care . . . , whether or not injury results . . . ." "Negligence is a well-recognized legal concept which describes conduct that falls below a standard of reasonable or due care. A failure to exercise due care contemplates an abdication of responsibilities or carelessness in executing one's duties." *Sillery v Bd of Med*, 145 Mich App 681, 686; 378 NW2d 570 (1985). "Without the existence of a legal duty, there can be no actionable negligence." *Oja v Kin*, 229 Mich App 184, 187; 581 NW2d 739 (1998). Whether a duty exists presents a legal question. *Murdock v Higgins*, 454 Mich 46, 53; 559 NW2d 639 (1997).

"[I]n general, there is no legal duty obligating one person to aid or protect another. Moreover, an individual has no duty to protect another from the criminal acts of a third party in the absence of a special relationship between the defendant and the plaintiff or the defendant and the third party." *Graves v Warner Bros*, 253 Mich App 486, 493; 656 NW2d 195 (2002) (citation omitted). Factors to consider in determining whether a duty exists include "the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented." *Murdock*, 454 Mich at 53. Other factors include "the degree of certainty of injury, the closeness of connection between the conduct and injury, the moral blame attached to the conduct, the policy of preventing future harm, and the burdens and consequences of imposing a duty and the resulting liability for breach." *Babula v Robertson*, 212 Mich App 45, 49; 536 NW2d 834 (1995). Once the existence of a duty has been established, whether the duty has been performed presents a question of fact. *Hammack v Lutheran Social Servs of Mich*, 211 Mich App 1, 5; 535 NW2d 215 (1995).

This Court has addressed a hospital's duty owed to a patient in *Chelik v Capitol Transp, LLC*, 313 Mich App 83; 880 NW2d 350 (2015). A patient sought treatment for a broken arm at a hospital, and the hospital discharged the patient with the advice that he see a specialist the next day for further treatment. *Id*. at 84-85. Hospital staff took the patient in a wheelchair to wait for a cab and left the patient alone. The cab driver attempted to help the patient out of the wheelchair and into the cab. The patient fell and hurt his arm. *Id*. at 85. This Court determined that the hospital had no duty to the patient because it "had no control over" the patient when the hospital had discharged the patient and called the cab at the patient's request. *Id*. at 91-92. This Court further determined that the manner in which the patient fell was not foreseeable because "his

-4-

condition had improved, his pain was controlled, . . . he was 'stable[,]' " and he "had passed a 'fall risk assessment after being able to stand up and walk by himself across the room." *Id*. at 92.

*Murdock*, 454 Mich at 55, involved the sexual assault of a teenage volunteer by an employee of the Department of Social Services. Our Supreme Court concluded that the employee's supervisor and the volunteer did not have a special relationship because the supervisor "had no knowledge of, contact with, or control over" the volunteer. The Supreme Court then considered whether the supervisor owed the volunteer "a duty not to hire or supervise [the employee] in a grossly negligent manner" because of their employment relationship, which could "form the basis for such a special relationship that would impose a duty . . . ." *Id*. at 55-56. The Supreme Court determined that a supervisor has such a duty, but the circumstances of the case did not give rise to that duty because the supervisor was the employee's former supervisor who had transferred the employee to another facility before the assault occurred. *Id*. at 56.

In *Dawe v Dr Reuven Bar-Levav & Assoc, PC*, 485 Mich 20, 22-23; 80 NW2d 272 (2010), the Supreme Court addressed the duty a psychiatrist owed to a patient participating in group therapy when another patient shot and killed a psychiatrist and another patient, and injured other patients, including the plaintiff-patient. Regarding the imposition of a duty as a function of a special relationship, the Court stated:

> The rationale behind imposing a duty to protect in these special relationships is based on control. In each situation one person entrusts himself to the control and protection of another, with a consequent loss of control to protect himself. The duty to protect is imposed upon the person in control because he is best able to provide a place of safety. [*Id*. at 26 (quotation marks and citation omitted).]

The Court noted that psychiatrists have "a duty of reasonable care to protect their patients" because psychiatrists and patients have a special relationship. *Id*. On remand, this Court concluded that the psychiatrists had a special relationship with the injured plaintiff-patient because they recommended group therapy and controlled the therapeutic setting, and because the patient entrusted herself to their care and did not have the training or information necessary to evaluate whether another patient posed a danger to her. *Dawe v Dr Reuven Bar-Levav & Assoc, PC (On Remand)*, 289 Mich App 380, 391-392; 808 NW2d 240 (2010). This Court further noted that the danger was foreseeable. *Id*. at 392. This Court concluded that the psychiatrists owed the patient "a duty to take reasonable precautions to ensure that the patients assigned to the group were sufficiently healthy to participate in group therapy." *Id*. This Court then determined that whether the psychiatrists' placement of the patient in group therapy met the standard of care was a factual question. *Id*. at 393.

> In this case, the ALJ addressed the nature of respondent's duty as follows:
>
> Respondent's duty to the injured patient in this case arises from his role as a hospital social worker on duty at the time and place of the incident . . . . The Respondent agreed that he had a duty to the crisis center's patients even those he was not actively seeing and that were not (yet) his patients . . . . By virtue of his employment at the crisis center, the Respondent had a duty to all patients in the hospital where he was working, including the victim in this case. The Respondent's duty is

different, and likely less than the duty owed to a patient by a health care provider who is actively treating the patient.

The DSC did not comment on the source of respondent's duty in its findings of fact and conclusions of law before it stated that "after the mental health technician assaulted the patient, Respondent failed to . . . take any meaningful action to protect the patient from his assailant." Because the DSC accepted the ALJ's findings and conclusions that it did not revise in its own findings and conclusions, the ALJ's determination that respondent's duty to the patient arose from his employment at the crisis center remains untouched.

The ALJ determined that Gottlieb had testified that respondent had no duty to prevent the initial assault when the technician punched the patient twice because it was unforeseeable. The DSC did not disagree. Accordingly, the question is what duty respondent owed the patient after the assault took place.

Respondent argues that he did not have a "free-standing duty" to protect the patient from the assault, noting that the ALJ correctly concluded that social workers do not have a broad duty to help anyone in danger. Respondent appears to raise this argument in response to Gottlieb's testimony that a social worker has a duty to intervene when someone is generally in danger, such as at a grocery store. Gottlieb later testified that respondent's duty to intervene on the patient's behalf arose from his employment at the hospital and from the Public Health Code. In response to this testimony, the ALJ determined that Gottlieb ultimately arrived at "the correct conclusion" that respondent's duty to the patient arose from his employment at the hospital and from being on duty when the incident occurred. Neither the ALJ nor the DSC, which did not amend the ALJ's description of the source of respondent's duty, concluded that respondent owed the patient a "free-standing duty." Accordingly, respondent challenges reasoning that did not form the basis of the disciplinary order.

Respondent argues that he did not have a "special relationship" with the patient that required him to protect the patient. Respondent's own testimony undermines this argument. Respondent testified that the crisis center was a locked area that was part of the emergency room and serviced psychiatric patients. He confirmed that patients could not leave the crisis center, even if they had gone to the center voluntarily, until they had seen the doctor. Respondent stated that he conducted psychosocial evaluations of patients and assessed patients' immediate needs, and he assisted patients with discharge. He also testified about the role of the MHT and the nurse in checking in patients. Respondent testified that patients could be violent or agitated and that he was trained in how to respond to violent patients, including dodging violence, alerting security when necessary, and using verbal de-escalation techniques. Respondent further testified that patient safety was his goal in reacting to the technician's behavior. Respondent's testimony shows that the hospital crisis center controlled when patients could leave. Respondent was one of the hospital staff members who exerted a level of control over the patients because he was part of the intake team that provided input to the doctor who saw the patients and determined their course of treatment. Respondent also facilitated patient discharge. Although it was unforeseeable that a staff member would become violent, respondent was trained in responding to sudden violence at the center, so the burden on respondent in reacting to the technician's unexpected burst of violent behavior was similar to the burden on respondent in reacting to patients who exhibited violence. Respondent was working at the crisis center, and the patient was in the crisis center when the

incident took place directly in front of him. Because respondent had a limited degree of control and limited interactions with patients, the ALJ correctly noted that respondent's duty to the patient was less than the duty owed to a patient by a treating healthcare provider. Nonetheless, the ALJ properly concluded that respondent had a duty to the patient because respondent was working at the crisis center at the time of the incident.

Respondent also takes issue with the DSC's imposition of a duty to "protect" the patient, with physical intervention if necessary, arguing that respondent had no such duty. Respondent's argument gives the word "protect" greater significance than the DSC did. The DSC described respondent's observation of the technician's physical assault, and it stated that the video showed that respondent did not leave the desk area after the assault and remained at the desk as if nothing had happened. The DSC noted that the video showed respondent's lips moving for a few seconds, but it did "not appear that he intervened or attempted to protect the patient." The DSC also rejected respondent's explanation that he calmed the technician down and spoke with the patient as inconsistent with other evidence of how respondent reacted. In this context, the DSC stated that respondent did not "take any meaningful action to protect the patient from his assailant." This statement questions the adequacy of respondent's reaction to the assault, which is a factual question separate from the legal question of respondent's duty.

Similarly, the DSC did not refer to physical intervention. Respondent contends that the DSC's observation that respondent never left the desk area shows that the DSC believed that respondent should have physically intervened. The DSC observed that respondent did not leave the desk area in the context of describing how respondent reacted to the assault before concluding that respondent did not "intervene[] or attempt[] to protect the patient," even though he moved his lips. The DSC noted that "[r]espondent sat at the desk as if nothing happened, while the assailant continued to complete the intake process for the patient." The DSC summarized respondent's testimony about his response, rejected his claim that he intervened verbally, and concluded that respondent took no action at all. The DSC's comment that respondent did not leave the desk area was one of a series of findings preceding the conclusion that respondent reacted as if nothing had happened, contrary to respondent's claim that he adequately intervened. Respondent testified that the emergency room, to which the crisis center was attached, had a security guard, so the reference to not leaving the desk area could have been with regard to his not going to alert the security guard in the emergency room. The DSC's comment that respondent did not leave the desk area could have also supported its skepticism of respondent's testimony that he reassured the patient, in contrast with the nurse who went to check on the patient, or that respondent verbally intervened at all. Accordingly, the DSC did not indicate that respondent was required to intervene physically to protect the patient. But whether respondent took adequate action was a question of fact.

Respondent argues that he did not have a duty to the patient because there was no evidence that the patient was an intended third-party beneficiary of respondent's employment with the hospital. Respondent cites *Oja*, 229 Mich App at 192-194, to support this argument. *Oja* was a medical malpractice case in which this Court concluded that the physician's contractual relationship with the hospital did not give rise to a duty to treat the patient, who was not a third-party beneficiary to the contract. *Id*. at 193-194. In *Oja*, the physician had been on call but did not report to the hospital for assistance when the patient was brought to the hospital and ultimately died. *Id*. at 185-186. *Oja* is distinguishable because in this case, respondent was on duty at the hospital at the time of the incident. Therefore, respondent's argument about his contractual

relationship with the hospital does not overcome the circumstances that gave rise to his legal duty to the patient.

## B. DUE PROCESS

Respondent argues that the DSC exceeded the scope of the complaint allegation that he failed to intervene when it concluded that respondent failed to protect the patient. We disagree. Whether respondent's right to due process "was violated is a question of law that this Court reviews de novo." *Dep't of Community Health v Risch*, 274 Mich App 365, 377; 733 NW2d 403 (2007). "Due process and the Administrative Procedures Act require that a party in a contested case be given timely and adequate notice detailing the reasons for the proposed administrative action." *Hardges v Dep't of Social Servs*, 177 Mich App 698, 702; 442 NW2d 792 (1989). In *Hardges*, 177 Mich App at 703-704, this Court ruled that the governmental agency was limited to the allegations stated in the notice provided to the recipient of food stamp assistance regarding the reasons for terminating that assistance. The Court noted that the agency's failure to give the recipient notice of the reason ultimately relied on for termination "prevented her from obtaining a full and fair hearing and deprived her of her right to due process." *Id.* at 704. The notice had stated that more people lived in the recipient's home than listed on the application for food stamps, but the agency terminated the food stamp assistance because the recipient did not cooperate or verify information about another member of her household. *Id.* at 700, 703-704. This case shows that the complaint must provide notice of the allegations sufficient for the respondent to defend against them.

In this case, the complaint describes the event supporting the disciplinary charges as follows: "a mental health technician struck a facility patient in the head twice, knocking him to the floor, and then dragged the patient across the floor into the patient's room. Respondent observed the mental health technician's conduct toward the patient and *took no action to intervene on the patient's behalf*." The DSC reached the following conclusions regarding respondent's reaction:

> Respondent witnessed a mental health technician physically assault a patient with a closed fist, knocking the patient to the floor. . . . The surveillance video . . . shows that after the assault, Respondent never left the desk area. Although the video does show Respondent moving his lips for a few seconds, *it does not appear that he intervened or attempted to protect the patient*. In addition, the video shows that Respondent sat at the desk as if nothing happened, while the assailant continued to complete the intake process for the patient.

> * * *

> Respondent's testimony at the hearing regarding his actions during the incident is self-serving and inconsistent. Respondent's testimony is not supported by the testimony of either Ms. Moner and Ms. Frazier or the surveillance video. The record reflects that Respondent, by his own admission, had a responsibility for patients in the crisis center. It is clear from the video surveillance recording of the incident that after the mental health technician assaulted the patient, Respondent *failed to any [sic] take any meaningful action to protect the patient from his*

*assailant*.  To the contrary, the video shows that after the incident, the Respondent returns to work as if nothing untoward had just happened.  [Emphasis added.]

"Intervene" is defined as "to interfere with the outcome or course especially of a condition or process (as to prevent harm or improve functioning)."  *Merriam-Webster's Collegiate Dictionary* (11th ed).  The word "protect" is defined as "to cover or shield from exposure, injury, damage, or destruction."  *Merriam-Webster's Collegiate Dictionary* (11th ed).  The overlap between these two words and the context of the DSC's use of the word "protect" shows that the DSC did not exceed the allegations in the complaint.  The crux of the allegation and of the DSC's conclusion was respondent's failure to act.  The DSC emphasized that respondent watched the interaction between the technician and the patient without taking any action at all, and the DSC rejected respondent's rationalization for what looked like inaction on the video.  As previously discussed, the DSC did not require respondent to intervene physically in the sense of placing himself in harm's way or physically restraining the technician.  Respondent continues to dispute whether the evidence showed that he took no action, which is a factual question.  Whether that inaction reflected a lack of *intervention* or a lack of *protection* is a distinction without a legally significant difference.  The DSC did not exceed the scope of the allegation in the complaint.

## C.  RESPONDENT'S REACTION

Respondent argues that substantial evidence does not support the DSC's conclusion that he failed to intervene adequately.  We disagree.  Judicial review of administrative decisions "shall include, as a minimum, the determination whether such final decisions, findings, rulings and orders are authorized by law; and, in cases in which a hearing is required, whether the same are supported by competent, material and substantial evidence on the whole record."  Const 1963, art 6, § 28.  "When reviewing whether an agency's decision was supported by competent, material, and substantial evidence on the whole record, a court must review the entire record and not just the portions supporting the agency's findings."  *Risch*, 274 Mich App at 372.  "[A] reviewing court may not set aside findings merely because alternative findings also could have been supported by substantial evidence on the record."  *Dep't of Licensing & Regulatory Affairs v Gordon*, 323 Mich App 548, 559; 919 NW2d 77 (2018) (quotation marks and citation omitted).  "Substantial evidence means evidence that a reasonable person would accept as sufficient to support a conclusion.  This may be substantially less than a preponderance of evidence, but does require more than a scintilla of evidence."  *Butler*, 322 Mich App at 465 (quotation marks and citation omitted).  "Deference must be given to an agency's findings of fact, especially with respect to conflicts in the evidence and the credibility of witnesses."  *Huron Behavioral Health v Dep't of Community Health*, 293 Mich App 491, 497; 813 NW2d 763 (2011) (citations omitted).  "Moreover, an appellate court must generally defer to an agency's administrative expertise."  *Dep't of Community Health v Anderson*, 299 Mich App 591, 598; 830 NW2d 814 (2013).

Respondent argues that substantial evidence does not support the DSC's conclusion that he took no action given that he successfully calmed the technician down.  Respondent's argument reduces the technician's inappropriate behavior to the three seconds during which the technician punched the patient in the face, while overlooking the technician's second encounter with the patient when the technician dragged the patient across the floor a few feet nearly one minute later.  The technician then let go, took the patient's hand again, and half-dragged the patient while the

patient got to his knees before the patient lost his balance, caught himself, and stood up when the technician let go. The technician demonstrated his impatience when he punched the patient, and the three seconds when the technician later dragged the patient before letting go showed that the technician's impatience persisted beyond the initial punching. Therefore, it is not accurate to say that the technician calmed down and resumed interacting normally with the patient.

Respondent argues that Gottlieb and the DSC improperly expected respondent to intervene physically. Respondent also criticizes Gottlieb's testimony that it would have been sufficient for respondent to call security, even if security might not have responded for several minutes, as inconsistent with the stated goal of patient safety. The ALJ did not require respondent to intervene physically or apply Gottlieb's testimony that calling security would have been sufficient no matter how long it took security to arrive. As previously discussed, the DSC did not state that respondent was required to intervene physically, nor did it fault him for failing to do so when it concluded that the evidence showed that respondent had no reaction at all. In addition, respondent's hypothetical questions about patient safety in the absence of a prompt response from security ignores testimony that security could have responded within 30 seconds to five minutes, not the five minutes, fifteen minutes, or one hour postulated by the question cited in respondent's brief. Respondent's arguments about Gottlieb's testimony are unavailing because they ignore the conclusions actually made by the DSC.

Respondent argues that the DSC's decision overlooked Gottlieb's and Moner's agreement that verbal de-escalation was the optimal response that would have best served the patient's safety. The DSC did not disagree that verbal de-escalation would have been a satisfactory intervention; rather, the DSC rejected respondent's testimony that he did intervene verbally when it concluded that respondent did nothing at all. It is possible that the DSC would not have concluded that respondent violated a general duty had it credited his testimony that he used verbal de-escalation. The DSC essentially concluded that respondent did nothing at all, and the ALJ's conclusion that respondent verbally intervened successfully reflected the ALJ's determination that respondent had a duty to take some action. Therefore, the disagreement between the ALJ and the DSC was not whether verbal de-escalation was sufficient, but whether respondent used verbal de-escalation.

Respondent faults the DSC for declining to credit respondent's testimony and failing to respond to the ALJ's observation that respondent's experience in the crisis center warranted crediting respondent's testimony. In the findings of fact, the ALJ found that Moner asked respondent why he did not intervene and that respondent told her he did not push the panic button because he was shocked and afraid of the MHT. The ALJ found that Frazier asked respondent why he did not intervene and that respondent stated that he was afraid the MHT would hit him. When the ALJ credited respondent's testimony that he talked to the technician and calmed him down, the ALJ did not refer to respondent's responses to Moner and Frazier. The DSC considered the statements respondent made to Moner and Frazier soon after the incident and credited those statements over respondent's hearing testimony more than one year after the incident in which he offered a rationalization for what appeared to be his inaction on the video. Respondent's emphasis on the value of verbal de-escalation as a tool of first resort is inconsistent with his failure to tell Moner and Frazier that he was able to defuse the situation by talking to the technician and the patient. Further, respondent's statements to Moner and Frazier that he was afraid the technician would turn on him is inconsistent with his testimony that he talked to the technician at all. To resolve these inconsistencies, this Court would have to decide what testimony to credit. However,

"resolving conflicts in the evidence by making credibility determinations is not a basis for reversal of an administrative action." *Anderson*, 299 Mich App at 599. Consequently, respondent's challenge to the DSC's credibility determination does not identify a basis for reversal.

Affirmed.

/s/ Cynthia Diane Stephens
/s/ David H. Sawyer
/s/ Jane M. Beckering