**Julio DIAZ and Katherine Diaz, Plaintiffs,**

v.

**SOUTH BEND LATHE INC., and Amsted Industries, Inc., Defendants.**

**SOUTH BEND LATHE INC., Defendant, Third-Party Plaintiff,**

v.

**AMRUM METAL INDUSTRIES, INC., Third–Party Defendant.**

No. 85 CV 4397.

United States District Court, E.D. New York.

Feb. 28, 1989.

Ted Trief, Trief & Olk, New York City, for plaintiffs.

Herzfeld & Ruskin, P.C., New York City, for Amsted.

McCarter & English, New York City, for South Bend Lathe.

## MEMORANDUM AND ORDER

McLAUGHLIN, District Judge.

Plaintiffs Julio and Katherine Diaz bring this action based on diversity of citizenship, 28 U.S.C. § 1332(a)(1), against defendants South Bend Lathe Inc. ("SBL") and Amsted Industries, Inc. ("Amsted") for personal injuries incurred by Julio Diaz while he was operating a power press manufactured by Johnson Machine and Press Corp. ("Johnson"). Plaintiffs name Amsted on the theory that it is a successor corporation to Johnson and, therefore, liable for the torts of its predecessor. Taking this a step further, plaintiffs name SBL on the ground that SBL is a successor to Amsted and, therefore, also liable for the torts of Johnson. Each defendant moves for partial summary judgment, pursuant to Fed.R.Civ. P. 56, dismissing plaintiffs' first cause of action sounding in strict products liability for the manufacture of the press. Defendants claim that, as a matter of law, they cannot be held liable for the torts of Johnson which manufactured and sold the mechanical press that allegedly injured plaintiff.

For the purposes of diversity jurisdiction, the plaintiffs are citizens of New York, defendant Amsted is a Delaware corporation, defendant SBL is an Indiana corporation and both defendants maintain their principal place of business in Indiana.

### FACTS

The undisputed material facts are as follows. On October 17, 1985, plaintiff Julio Diaz suffered personal injury, amputation of his left index finger, while he was operating a Johnson 55 BG mechanical pin clutch press at his place of employment, Amrum Metal Industries, Inc. ("Amrum"). Mr. Diaz filed suit against Amsted and SBL alleging three causes of action. The first sounded in stricts product liability for the manufacture of the press and for the manufacture of a replacement lock, the second in breach of warranty and the third in negligence. A fourth cause of action is

brought by Mrs. Diaz for her loss of services.

The mechanical press that injured Mr. Diaz was manufactured by Johnson in 1956 at its plant in Elkart, Indiana. Subsequently, on August 28, 1956, Bontrager Construction Company, later Bontrager Corporation ("Bontrager"), purchased the assets and assumed the liabilities of Johnson. Bontrager, manufacturing the presses under the Johnson trade name at the Elkhart plant, carried on the business of Johnson substantially intact until 1962.

On August 2, 1962, the shareholders of Bontrager resolved to sell all of Bontrager's corporate assets to Amsted and then to dissolve Bontrager.

On August 29, 1962, the sale of Bontrager's assets to Amsted as well as the assumption of certain liabilities by Amsted was consummated. The sale was memorialized in a purchase agreement stating, among other things, that Amsted purchases for cash Bontrager's plants, lands, designs, inventories, work in progress, patents, trademarks, and customer lists. Also, the purchase agreement indicates that sales representative contracts would be maintained as well as other then existing manufacturing contracts. In addition, Amsted secured a covenant not to compete from Bontrager's shareholders; and Bontrager's real property was transferred with the stipulation that it would be used for continuing operations. Finally, Amsted agreed to make best efforts to hire all of Bontrager's employees with the exception of three management level personnel. Amsted did not agree, however, to warrant presses manufactured and sold by Bontrager before the August 29 transaction.

Once the transaction was complete, Amsted transferred its right and obligations under the purchase agreement to its wholly owned subsidiary, South Bend Lathe Inc. ("SBL–II"). SBL–II, without interruption, continued to manufacture presses under the Johnson trade name until 1965. On September 29, 1965, SBL–II was dissolved and its assets were transferred to Amsted. Thereafter, Amsted, through its South Bend Lathe division, manufactured Johnson presses out of a plant in South Bend, Indiana—a plant never used by Bontrager or Johnson.

In the meantime, Bontrager existed merely as a shell corporation holding onto the cash from the sale until it was dissolved on July 29, 1964. The only business activity in which Bontrager engaged was the procurement of product liability insurance for products manufactured before the sale of its assets.

Amsted's South Bend Lathe division continued to manufacture Johnson pin clutch presses until 1968. In 1968, Amsted notified its customers that it was totally discontinuing production of the pin clutch press. Amsted informed its customers that it would concentrate solely on the production of "air clutch" presses, which it described as an entirely different and distinct type of mechanical press.

The South Bend Lathe division continued production of air clutch presses until July 3, 1975 when Amsted sold the entire South Bend Lathe division to LWE, Inc. for cash. The agreement entered into between the parties indicates that LWE, Inc. purchased the South Bend plant, the equipment necessary to manufacture Johnson air clutch presses, as well as Amsted's inventory, patents, trademarks, and all assignable sales contracts. Thereafter, LWE, Inc. changed its name to South Bend Lathe ("SBL")—the defendant in this action. SBL currently manufactures air clutch presses under the Johnson trade name at the South Bend plant.

To sum up, the chain of succession of the entities that were in the business of manufacturing and selling Johnson presses is Johnson to Bontrager to Amsted to SBL.

## DISCUSSION

The law in New York is well settled on the issue of successor corporation liability. In short, a successor corporation, which acquires the assets of another corporation—the predecessor—is *not* liable for the torts of the predecessor corporation *unless* (1) it assumes such liability either expressly or impliedly; (2) the two corporations were

merged into one; (3) the successor corporation is a mere continuation of the predecessor; or (4) the transaction was fraudulently executed to escape such obligations. *See Grant–Howard Associates v. General Housewares Corp.,* 63 N.Y.2d 291, 296, 472 N.E.2d 1, 3, 482 N.Y.S.2d 225, 227 (1984); *Schumacher v. Richards Shear Co.,* 59 N.Y.2d 239, 244, 451 N.E.2d 195, 198, 464 N.Y.S.2d 437, 440 (1983). The second exception involving merger also encompasses consolidations and *de facto* mergers. *See Santa Maria v. Owens–Illinois, Inc.,* 808 F.2d 848, 860 (1st Cir.1986) (interpreting New York law); *Lumbard v. Maglia, Inc.,* 621 F.Supp. 1529, 1535 (S.D.N.Y.1985); *Ladjevardian v. Laidlaw–Coggeshall, Inc.,* 431 F.Supp. 834, 838 (S.D.N.Y.1977).

Defendants concede that Bontrager was a "mere continuation" of Johnson and, therefore, Bontrager would be liable for the torts of its predecessor if it were still in existence. Defendant Amsted argues, however, that it is not liable as a successor to Bontrager because the purchase of Bontrager's assets does not bring it within any of the four exceptions to the general rule. Defendant SBL adopts Amsted's argument contending that if Amsted is not liable, then the chain of succession is broken and SBL is not liable to plaintiff either. SBL alternatively asserts that even if Amsted is liable, it should not be held liable as a successor corporation because its purchase of a portion of Amsted's assets does not bring it within any of the four exceptions.

Plaintiffs counter that liability for defects in the Johnson press attaches to Amsted on several alternative grounds: (1) Amsted is a "mere continuation" of Bontrager; (2) Amsted and Bontrager engaged in a *de facto* merger; (3) Amsted is liable under the "continuation of enterprise" doctrine; (4) Amsted is liable under the "product line" doctrine; and (5) Amsted breached its "duty to warn" plaintiffs of the press' defects.

Plaintiffs contend that SBL is a successor to Amsted and thereby liable to the plaintiffs on the same grounds as Amsted.

### A. Mere Continuation

The mere continuation exception "refers to corporate reorganization ... where only one corporation survives the transaction; the predecessor must be extinguished." *Schumacher, supra,* 59 N.Y.2d at 244, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. A continuation " 'envisions a common identity of directors, stockholders and the existence of only one corporation at the completion of the transfer.' " *Parra v. Production Machine Co.,* 611 F.Supp. 221, 224 (E.D.N.Y. 1985) (*quoting Ladjevardian v. Laidlaw–Coggeshall, Inc., supra,* 431 F.Supp. at 839).

In the instant case, when Bontrager sold its assets to Amsted, Bontrager continued to exist for nearly two years until its dissolution. If the predecessor corporation continues to exist after the transaction, in however gossamer a form, the mere continuation exception is not applicable. *See Schumacher, supra,* 59 N.Y.2d at 244–45, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. In addition, the identity of shareholders and directors of Bontrager and Amsted remained distinct before and after the transaction. The mere continuation exception, therefore, is not applicable to hold Amsted liable to plaintiffs. Having broken the chain of succession, it also follows that SBL cannot be liable to plaintiffs under this exception.

### B. De Facto Merger

For the Court to find that a *de facto* merger has occurred between Bontrager and Amsted, it must find a legal continuity between predecessor Bontrager and successor Amsted, as evidenced by: continuity of ownership; cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and a continuity of management, personnel and physical operation. *See Arnold Graphics Indus. Inc. v. Electronic Tabulating Corp.,* 775 F.2d 38, 42 (2d Cir.1985); *Lumbard, supra,* 621 F.Supp. at 1535. It is not necessary to satisfy all of these

factors to find a merger; rather, these factors are only indicators that tend to show a *de facto* merger. *See Lumbard, supra,* 621 F.Supp. at 1535; *Menacho v. Adamson United Co.,* 420 F.Supp. 128, 133 (D.N.J.1976). *See also* 15 Fletcher Cyclopedia of the Law of Private Corporations § 7165.5 at 339 (perm.ed. 1983) (citing these as "[f]actors which are indicative of a *de facto* merger").

### 1. *Continuity of Ownership*

This factor questions whether shareholders of the predecessor become, at the time of the sale of assets, shareholders of the successor corporation. *See Arnold Graphics, supra,* 775 F.2d at 42. Usually, this is accomplished by compensating the predecessor shareholders with stock of the successor. *See, e.g., Arnold Graphics, supra,* 775 F.2d at 42; *Menacho v. Adamson United Co.,* 420 F.Supp. 128, 134–35 (D.N.J.1976).

In the instant case, the only consideration Bontrager received in return for the sale of its assets was cash—no stock of either corporation was transferred. Indeed, plaintiffs concede that before and after the asset sale, the identity of the shareholders of both corporations remained distinct. *See* Plaintiff's Memorandum of Law in Opposition to Amsted's Motion for Partial Summary Judgment 6.

There is a view that this "continuity of ownership" is essential to the finding of a *de facto* merger. *See, e.g., Travis v. Harris Corp.,* 565 F.2d 443, 447 (7th Cir.1977); *Bazan v. Kux Machine Co.,* 358 F.Supp. 1250, 1252 (E.D.Wis.1973). *See also* J. Phillips, *Product Line Continuity and Successor Corporation Liability,* 58 N.Y. U.L.Rev. 906, 912–13 (1983) [hereinafter *Successor Corporation Liability* ] (discussing origins of this element). In *Travis,* for example, the court held that because the purchase of all of the predecessor's assets was in cash rather than in stock of the successor, there was no continuity of ownership and, therefore, no *de facto* merger. *See id.,* 565 F.2d at 447.

This view, however, is disputed. In *Cyr v. B. Offen & Co., Inc.,* 501 F.2d 1145 (1st Cir.1974), the court held that when the same employees continue, without pause, to produce the same products, in the same plant, with the same supervision, the identity of the ownership cannot be the sole determinant of liability. *See id.,* 501 F.2d at 1154. The Court's reasoned that a successor, who carries on the manufacturing and servicing of the predecessor's line of equipment, can best bear the cost of insuring against liability. Ultimately, the successor is the only one to look to for improvement of the product's quality. *See id.* In addition, although the successor is not the legal entity that launched the product into the stream of commerce, it certainly would profit from exploiting the accumulated goodwill attached to the product. *See id.*

The reasoning of *Cyr* is sound. The consuming public should not be frustrated merely because the stock ownership of a corporation has not changed while all else —employees, product, supervision, and plants—are transferred to a successor who continues the business. *See generally Polius v. Clark Equipment Co.,* 802 F.2d 75, 85 (3rd Cir.1986) (Mansmann, concurring and dissenting). To permit the successor corporation to avoid liability by structuring the transaction so that no stock is transferred is to exalt form over substance.

The Court, therefore, will consider the balance of the factors to determine whether Bontrager and Amsted, in substance, engaged in a *de facto* merger.

### 2. *Cessation and Dissolution*

The facts make it clear that Bontrager ceased business on August 29, 1962 when it sold all its assets, including the Johnson trade name, to Amsted. From August 29, 1962 until Bontrager's dissolution on July 29, 1964, Bontrager's only business activity, other than its holding cash from the asset sale, was to procure product liability insurance coverage for products it manufactured and shipped before the asset sale to Amsted.

Although Bontrager was not dissolved until nearly two years after the transaction, the shareholders of Bontrager voted

on August 2, 1962, *prior* to the sale, to dissolve Bontrager as soon as possible after the close of the sale of its assets. Thus, it is fair to infer, and defendants have not contested, that the shareholders acted promptly in dissolving Bontrager after the asset sale to Amsted.

The cessation of business and the shareholders' plan to dissolve point toward a finding of a *de facto* merger between Bontrager and Amsted.

### 3. *Assumption of Liabilities*

The inquiry here is whether the successor corporation assumed the liabilities of the predecessor, permitting the successor to continue the ordinary business of the predecessor without interruption. Amsted agreed to assume the existing manufacturing contracts and sales representative contracts. It also agreed to use its best efforts to hire all of Bontrager's employees. In fact, Amsted hired approximately 95% of Bontrager's employees.

The assumption of these liabilities and obligations makes it clear that Amsted purchased an ongoing business with a sales force, a source of business—the existing manufacturing contracts, and a work force to satisfy those contracts.

Amsted notes that it did not expressly assume Bontrager's warranty obligations or other liability for the Johnson presses. This, it says, establishes that there was a discontinuity in the normal business operations from Bontrager to Amsted. The argument overlooks, however, that the ordinary business operations of a manufacturer do not depend on whether it offers warranties. Rather, operations depend on manufacturing contracts and the ability to satisfy those contracts.

### 4. *Continuity of Management, Etc.*

It is clear that Amsted did not hire any of Bontrager's directors or officers and,

thus, there was no continuity of upper-tier management. Amsted, however, did hire most of Bontrager's employees including the day to day supervisory personnel. In addition, Amsted, through its subsidiary, continued to use Bontrager's plants, lands, designs, inventories, work in progress, patents, trademarks and customer lists.

This factor, like the assumption of liability factor just discussed, establishes that Amsted basically continued Bontrager's general business operations in all respects with the exception of ownership and top management.

Indeed, the very fact that Amsted could transfer the whole Bontrager asset package to a subsidiary to operate Bontrager's past business is of critical significance. Amsted simply incorporated—or merged—Bontrager's ongoing business into that of its own and the two corporations continued as one.

The Court, therefore, finds that the Bontrager business entity—the plant, the product, the existing sales contracts, and the employees—continued to exist in Amsted after the transaction. Hence, the *de facto* merger exception applies and the plaintiff may impose liability on Amsted for the torts of its predecessors.

As for SBL, on the other hand, the Court finds that Amsted and SBL did not engage in a *de facto* merger. As indicated, it is inherent in the *de facto* merger doctrine that after the predecessor sells its assets to the successor, the predecessor dissolve as soon as practicable. Amsted has never dissolved; it continues in existence.

### C. Continuation of Enterprise

■ Plaintiffs argue that liability attaches to SBL as a successor corporation to Amsted under the emerging "continuation of enterprise" doctrine set forth in *Turner v. Bituminous Casualty Co.*, 397 Mich. 406, 244 N.W.2d 873 (1976).[1] That doctrine imposes liability on the successor corpora-

---

1. The New York Court of Appeals has wrestled unsuccessfully with the question whether New York law imposes strict products liability based upon the continuation of enterprise or products line (discussed *infra*) theories. *See Schumacher, supra,* 59 N.Y.2d at 245, 451 N.E.2d at 198,

464 N.Y.S.2d at 440. The *Schumacher* court stated that "there are no facts alleged *which warrant our consideration* or application of the 'product line' or 'continuity of enterprise' theories." *See id.,* 59 N.Y.2d at 243, 451 N.E.2d at 197, 464 N.Y.S.2d at 439 (emphasis added). The

tion if there has been a basic continuity of the predecessor enterprise in the successor corporation and the original entity ceased its ordinary business operation by dissolving promptly after the transaction. Because Amsted remains in existence after the Amsted–SBL transaction, this doctrine is not available to impose liability on SBL.

## D. Products Line

■ The product line doctrine, set forth in *Ray v. Alad Corp.*, 19 Cal.3d 22, 560 P.2d 3, 136 Cal.Rptr. 574 (1977), imposes liability on the successor corporation if the successor continues to manufacture essentially the same line of products as the predecessor. The underpinnings of this doctrine are twofold. The first is that the successor should be liable to an injured plaintiff when it has left the plaintiff without a remedy against the original manufacturer by acquiring the assets of the manufacturer. *See Ramirez, supra,* 86 N.J. at 358, 431 A.2d at 825 (Schreiber, J., concurring) ("The central thesis of the [product line doctrine] is premised on the elimination by the successor of an effective remedy. That is an essential condition precedent to recovery."); *Brotherton v. Celotex Corp.,* 202 N.J.Super. 148, 158–59, 493 A.2d 1337, 1342 (1985) ("The product line theory is designed to liberalize recovery for plaintiff left remediless against a defunct corporation."); *Schweitzer v. Consolidated Rail Corp.,* 65 B.R. 794, 804–05 (E.D.Pa.1986) (implicit in the product line doctrine is the requirement that a remedy be unavailable); *Salvati, supra,* 130 Misc.2d 626, 497 N.Y.S. 2d at 247 (the product line doctrine looks primarily to the availability of a remedy, and implicitly to the location of a 'deep pocket' to furnish that remedy).

The second underpinning is that it is fair to require the successor corporation to assume responsibility for a defective product manufactured by the predecessor corporation when the successor now enjoys the corresponding goodwill associated with the product previously generated by the predecessor. *See Ramirez, supra,* 86 N.J. at 349, 431 A.2d at 820; *Ray, supra,* 19 Cal. 3d at 31, 560 P.2d at 9, 136 Cal.Rptr. at 580.

Plaintiffs' contention that this doctrine would result in the imposition of successor liability on SBL is unfounded. First, plaintiffs are not without a remedy because Amsted, the entity which caused the unavailability of the manufacturer, is still in existence and a party to the action. Second, as a factual matter, SBL did not purchase from Amsted the same product line of presses that injured the plaintiffs. Johnson, Bontrager and Amsted manufactured "pin clutch" presses. In 1968, Amsted discontinued the pin clutch product line and manufactured an entirely separate and distinct type of mechanical power press known as an "air clutch" press. In 1975, SBL purchased this air clutch product line and was never involved in the manufacture of pin clutch presses. SBL, therefore, never benefited from the goodwill generated in the pin clutch product line by Amsted and its predecessors. Instead, SBL benefited from the goodwill generated by Amsted from 1968 to 1975 in the new air clutch type of mechanical press. Under such circumstances, it would be unfair and inconsistent with the underpinnings of *Ray* and its progeny to impose liability on SBL for a product line from which it never received any benefit.

## E. Duty to Warn

■ Finally, plaintiffs contend, pursuant to *Schumacher, supra,* 59 N.Y.2d 239, 451

---

court later volunteered that "[w]e do not adopt the [product line or continuation of enterprise doctrines] but note that both are factually distinguishable in any event." *See id.,* 59 N.Y.2d at 245, 451 N.E.2d at 198, 464 N.Y.S.2d at 440. As a result of this indecision, lower New York courts have split as to whether these doctrines have been rejected. *Compare Radziul v. Hooper, Inc.,* 125 Misc.2d 362, 479 N.Y.S.2d 324, 326 (Sup.Ct.Monroe County 1984) (interpreting *Schumacher* as rejecting both doctrines) *with*

*Salvati v. Blaw–Lenox Food and Chemical Equipment, Inc.,* 130 Misc.2d 626, 497 N.Y.S.2d 242, 245–46 (Sup.Ct., Queens Co. 1985) (interpreting *Schumacher* as leaving the issue open). *See also Santa Maria v. Owens–Illinois, Inc., supra,* 808 F.2d 848, 858 & n. 11 (speculating on what the *Schumacher* court intended to hold).

Because of the decision reached by this Court, there is no need to decide the issues left obscure in *Schumacher.*

N.E.2d 195, 464 N.Y.S.2d 437, that SBL is liable for its failure to warn plaintiff Julio Diaz's employer of the potentially dangerous condition of the mechanical press. In *Schumacher,* the Court of Appeals held that a successor corporation may have an independent duty to warn customers of the predecessor as to a machine's dangerous condition when there is a sufficient link between the successor and the customer. Such a link exists when the following are present: coverage of the particular machine under a service contract, service of that machine by the purchaser corporation; and the successor's knowledge of defects in the machine. *See Schumacher, supra,* 59 N.Y.2d at 247, 451 N.E.2d at 199, 464 N.Y. S.2d at 441 (*citing Travis v. Harris Corp.,* 565 F.2d 443, 449 (7th Cir.1977).

That SBL was aware of possible defects in the machine presses and the owner's identity and the location of the machine that injured the plaintiff are not enough to impose liability under this doctrine. The successor must have a service or maintenance contract that covers the potentially dangerous machine and the successor must have in fact serviced the machine. *See Schumacher, supra,* 59 N.Y.2d at 248–49, 451 N.E.2d at 200, 464 N.Y.S.2d at 442 (the successor corporation must actively offer to service the potentially dangerous machine). *See also Tucker v. Paxson Machine Co.,* 645 F.2d 620, 626–27 (8th Cir. 1981); *Jacobs v. Lakewood Aircraft Service, Inc.,* 512 F.Supp. 176, 185–86 (E.D.Pa. 1981); *Ayala v. V & O Press Co.,* 126 A.D.2d 229, 236–37, 512 N.Y.S.2d 704, 708–09 (2d Dep't 1987).

Because SBL never engaged in the service or maintenance of any machinery at Amrum Metal Industries, Inc.—Mr. Diaz's employer (*See* Affidavit of L. Kurzweil in Support of Motion for Partial Summary Judgment on Behalf of South Bend Lathe, Inc.) liability cannot be imposed on SBL pursuant to the duty to warn doctrine.

## CONCLUSION

For the foregoing reasons, Amsted's motion for partial summary judgment is denied and SBL's motion for partial summary

judgment to dismiss plaintiffs first cause of action sounding in strict liability for the manufacture of the Johnson press is granted.

SO ORDERED.