FOSTER v CONE-BLANCHARD MACHINE COMPANY

Docket No. 108465. Argued November 9, 1998 (Calendar No. 8). Decided
    July 20, 1999. Rehearing denied 461 Mich 1205.

    Evia I. Foster, brought an action in the Lenawee Circuit Court against
        Seven Ranges, Inc., her employer, and Cone-Blanchard Machine
        Company, for damages resulting from injuries suffered in the
        course of her employment. She alleged that Cone-Blanchard was
        the successor of Cone Automatic Machine Company, the manufac-
        turer of the machine that caused her injuries, and thus liable for a
        design or manufacturing defect, breach of warranty of fitness for
        intended purpose and implied warranty of merchantability, and
        breach of the duty to warn of known or reasonably suspected dan-
        ger posed by the operation of the machine. The court, Harvey A.
        Koselka, J., granted summary disposition for Cone-Blanchard,
        determining that it was not a successor corporation for purposes of
        successor liability, and dismissed the plaintiff's claim of failure to
        warn of alleged defects. The Court of Appeals, MICHAEL J. KELLY,
        P.J., and HOOD and H. D. SOET, JJ., reversed, holding that the plain-
        tiff had established a question of fact concerning whether there
        was sufficient continuity of enterprise for successor liability and
        whether Cone-Blanchard had breached a duty to warn of the
        machine's alleged defects. 221 Mich App 43 (1997) (Docket No.
        187389).

        In an opinion by Chief Justice WEAVER, joined by Justices TAYLOR,
    CORRIGAN, and YOUNG, the Supreme Court held:

        Because Cone-Blanchard's predecessor was available for
    recourse, as witnessed by plaintiff's negotiated settlement with the
    predecessor for $500,000, the continuity of enterprise theory of suc-
    cessor liability is inapplicable. Further, summary disposition was
    appropriate with regard to the claim of breach of duty to warn. The
    plaintiff did not produce evidence sufficient to show a relationship
    between Cone-Blanchard and her employer or that Cone-Blanchard
    actually was aware of the alleged design defect in the type of
    machine owned by her employer.

        1. Under *Turner v Bituminous Casualty Co*, 397 Mich 406
    (1976), a prima facie case of continuity of enterprise exists where

the plaintiff establishes that there is continuation of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations of the predecessor corporation; the predecessor corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible; the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation; and the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation. Cone Automatic Machine Company, the manufacturer, is twice removed from defendant Cone-Blanchard. Although in the appropriate case a tertiary successor might be liable for a manufacturer's defective product, on the basis of the interpretation of *Turner*, this is not such a case.

2. Under *Turner*, the continuity of enterprise doctrine applies only when the transferor is no longer viable and capable of being sued. Where a plaintiff has in fact successfully pursued a remedy against a predecessor, the policy concerns that underscored the adoption of the continuity of enterprise theory in *Turner* simply are not present. In this case, in light of the availability of Pneumo Abex to suit as evidence by plaintiff's $500,000 settlement with Pneumo Abex, *Turner* is inapplicable.

3. Consistent with general negligence principles, a successor corporation's duty to warn a predecessor's customer of the predecessor's negligence requires a special relationship between either the defendant and the victim, or the defendant and the third party who caused the injury. The mere status of a defendant as a successor corporation is insufficient to create a duty to warn. Relevant indicia of a special relationship include a successor's actual or constructive knowledge of a defect in its predecessor's product, a continuing relationship with the predecessor's customer, service agreements between the successor and the predecessor's customer relating to the machine in question, and evidence that the successor had actually serviced the machine in question. A successor's awareness of the location or present owner of a defective product is a logical predicate to liability. In this case, Cone-Blanchard did not have a duty to warn of alleged defects in the machine at issue. While Cone-Blanchard may have solicited continuing business from Cone Automatic's customers, such evidence, alone, is insufficient to support a special relationship.

Reversed.

Justice BRICKLEY, joined by Justices CAVANAGH and KELLY, dissenting, stated that under *Turner*, the evidence presented by the plain-

tiff is more than adequate to go to a jury regarding whether Cone-Blanchard Machine Company is a corporate successor to Cone Automatic Machine Company. The plaintiff also has submitted evidence sufficient to raise questions of fact regarding whether Cone-Blanchard had a duty to warn the plaintiff of the dangers presented by the machine in question.

The successor liability issue in this case is controlled by *Turner*, which held that there may be a cause of action for a plaintiff where the totality of the transaction demonstrates a basic continuity of the enterprise. *Turner*'s continuity of enterprise doctrine does not simply seek to guarantee that the plaintiff has some source of recovery, nor is it based on principles of strict liability, as the majority apparently believes. Rather, the test in *Turner* is designed to determine whether the company (or "enterprise") involved in a lawsuit is essentially the same company that was allegedly negligent in designing or manufacturing the offending product. *Turner*, thus, eschewed reliance upon the legal formalities of corporation law, and sought to determine, by examining the relevant criteria, whether the corporate defendant, in essence, was a continuation of the corporation that was allegedly negligent in designing or manufacturing the product at issue, or whether it was a stranger to the allegedly negligent corporation.

*Baker, Durst, Nelson, Benz & Baldwin* (by *Gary R. Baldwin*) for plaintiff-appellee.

*Sullivan, Ward, Bone, Tyler & Asher, P.C.* (by *Thomas M. Slavin* and *Ronald S. Lederman*), for defendant-appellant.

Amici Curiae:

*Lupo & Koczkur, P.C.* (by *Paul S. Koczkur* and *Dane A. Lupo, Jr.*), for Pneumo Abex Corporation.

*Ford & Kobayashi, P.C.* (by *James B. Ford*), for Michigan Trial Lawyers Association.

WEAVER, C.J. In this products liability case, we examine the scope of successor liability in general, and of a successor corporation's duty to warn its customers of defects in a product manufactured by its

predecessor. The trial court granted defendant Cone-Blanchard Machine Company's motion for summary disposition. The Court of Appeals reversed, holding that summary disposition was improper. It concluded that the plaintiff established a prima facie case of continuity of enterprise sufficient to allow a products liability claim against Cone-Blanchard. It also concluded that the plaintiff had established facts sufficient to allow the claim of breach of duty to warn to go forward.

We reverse and hold that, because Cone-Blanchard's predecessor was available for recourse as witnessed by plaintiff's negotiated settlement with the predecessor for $500,000, the continuity of enterprise theory of successor liability is inapplicable. Further, plaintiff did not produce evidence sufficient to show a relationship between Cone-Blanchard and plaintiff's employer or that Cone-Blanchard was actually aware of the alleged design defect in the type of machine owned by plaintiff's employer. Thus, summary disposition was appropriate with regard to the claim of breach of duty to warn.

I

FACTUAL AND PROCEDURAL BACKGROUND

While operating a Conomatic feed screw machine on her job at defendant Seven Ranges, Inc., plaintiff's hair became ensnarled in the rapidly spinning and unguarded rod being processed by the machine. Her hair and scalp were torn from her head. Plaintiff sued Cone-Blanchard and Seven Ranges. She alleged that Cone-Blanchard was liable as the legal successor of

Cone Automatic Machine Company (Cone I), the company that designed and manufactured the machine in 1943.

Plaintiff specifically alleged a design or manufacturing defect on the ground that the machine contained no emergency shutoff button or other safety devices. She also alleged breach of warranty of fitness for intended purposes and breach of implied warranty of merchantability. Finally, she alleged that Cone-Blanchard breached its duty to warn of the known or reasonably suspected danger posed by operation of the machine.

Defendant Cone-Blanchard filed a motion for summary disposition pursuant to MCR 2.116(C)(10). Defendant argued that it could not be liable because it was not the manufacturer of the machine. Further, Cone-Blanchard argued that there was no continuity of enterprise between Cone I, the manufacturer, and itself that would support imposition of successor liability.

In 1963, Pneumo Dynamics purchased Cone I by acquiring all its stock. Shortly thereafter, Cone I ceased operations and dissolved. Pneumo Dynamics formed Cone Automatic Machine Co, Inc. (Cone II). Cone II had no employees, assets, or place of business and existed solely to hold the Cone name. Pneumo Dynamics continued to manufacture the Conomatic line of machines through a wholly owned subsidiary, Pneumo Dynamics Machine Tool Group (PDMTG). PDMTG included assets of the dissolved Cone I in addition to assets from two other machine companies.

In 1972, Cone-Blanchard purchased the assets of PDMTG and the stock of Cone II from Pneumo Dynam-

ics and, thereafter, continued the manufacture and design of the Conomatic line of screw machines. Pneumo Dynamics ceased designing and manufacturing the Conomatic line of screw machines, although it remained an active corporation. Pneumo Dynamics changed its name to Pneumo Abex Corporation.

The trial court granted defendant Cone-Blanchard's motion for summary disposition, determining that it was not a successor corporation for purposes of successor liability under *Turner v Bituminous Casualty Co*, 397 Mich 406; 244 NW2d 873 (1976). The trial court also dismissed plaintiff's claim that Cone-Blanchard failed to warn of. alleged defects in the machine. The Court of Appeals reversed, holding that plaintiff had established a question of fact concerning whether there was sufficient continuity of enterprise for successor liability and whether Cone-Blanchard had breached a duty to warn of the machine's alleged defects.[1] We granted leave to appeal.[2] We review a motion for summary disposition de novo.[3]

---

[1] 221 Mich App 43; 560 NW2d 664 (1997).

[2] 457 Mich 866 (1998).

[3]   In reviewing a motion for summary disposition brought under MCR 2.116(C)(10),   a trial court considers affidavits, pleadings, depositions, admissions, and documentary evidence filed in the action or submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. A trial court may grant a motion for summary disposition under MCR 2.116(C)(10) if the affidavits or other documentary evidence show that there is no genuine issue in respect to any material fact, and the moving party is entitled to judgment as a matter of law. MCR 2.116(C)(10), (G)(4). [*Quinto v Cross & Peters Co*, 451 Mich 358, 362; 547 NW2d 314 (1996).]

II

CONTINUITY OF ENTERPRISE

In *Turner, supra,* this Court held that a corporate successor may be liable for its predecessor's defective products if the totality of the acquisition demonstrates a basic continuity of the enterprise between the predecessor and successor corporations. Thus, under *Turner,* successor liability becomes an element of the plaintiff's prima facie case of products liability. *Turner* was a departure from the traditional rule of nonliability for corporate successors who acquire the predecessor through a purchase of assets.[4]

The traditional rule of successor liability examines the nature of the transaction between predecessor and successor corporations. If the acquisition is accomplished by merger, with shares of stock serving as consideration, the successor generally assumes all its predecessor's liabilities. However, where the purchase is accomplished by an exchange of cash for assets, the successor is not liable for its predecessor's liabilities unless one of five narrow exceptions applies. The five exceptions are as follows:

> " '(1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.' (19

---

[4] There is no need to address the continuing viability of *Turner* because we hold that plaintiff is not entitled to relief under it.

Am Jur 2d, Corporations, § 1546, pp 922-924; *Malone v Red Top Cab Co*, 16 Cal App 2d 268, 273 [60 P2d 543 (1936)].)"
[*Turner, supra* at 417, n 3, quoting *Schwartz v McGraw-Edison Co*, 14 Cal App 3d 767; 92 Cal Rptr 776 (1971).][5]

The traditional rule reflects the general policy of the corporate contractual world that liabilities adhere to and follow the corporate entity. It serves to protect creditors and shareholders, to facilitate determination of tax responsibilities, and to promote free alienability of business assets. In the context of tort law, the traditional rule with its narrow exceptions has been criticized as an elevation of form over substance, that may leave victims of a defective product without recourse.

These policy concerns shaped this Court's expansion of the traditional rule in *Turner*. After examining the relevant policy concerns, this Court in *Turner* concluded that a continuity of enterprise between a successor and its predecessor may force a successor to "accept the liability with the benefits" of such continuity. *Id.* at 430. *Turner* held that a prima facie case of continuity of enterprise exists where the plaintiff establishes the following facts: (1) there is continuation of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations of the predecessor corporation; (2) the predecessor corporation ceases its ordinary business operations, liquidates,

---

[5] Plaintiff did not separately argue that Cone-Blanchard expressly or impliedly assumed Cone I's liabilities. Plaintiff's argument that Cone-Blanchard assumed Cone I's liabilities arises only under *Turner's* continuity of enterprise theory that includes consideration of whether the purchasing corporation assumed those liabilities and obligations of the seller ordinary and necessary for the uninterrupted continuation of normal business operations of the seller.

and dissolves as soon as legally and practically possible; and (3) the purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the selling corporation. *Turner* identified as an additional principle relevant to determining successor liability, whether the purchasing corporation holds itself out to the world as the effective continuation of the seller corporation.[6]

Application of *Turner* in this case is complicated by the fact that the manufacturer, Cone I, is twice removed from defendant Cone-Blanchard. In other words, Cone-Blanchard did not directly purchase Cone I. Rather, Cone I was purchased by Pneumo Dynamics. Pneumo Dynamics then continued manufacturing the Conomatic line of machines through its wholly owned subsidiary, PDMTG, and formed a new company, Cone II, for purposes of carrying on the Cone name. Cone-Blanchard purchased the assets of PDMTG and the stock of Cone II. It then took over the manufacture of Conomatic machines. We note at the outset, that the tertiary nature of the relationship between Cone I and Cone-Blanchard generally factors against a finding of continuity, but does not preclude it.[7]

---

[6] This principle has been called the fourth guideline of the *Turner* continuity of enterprise analysis. However, we note that a truer reading of *Turner* suggests that the first three guidelines were intended to complete the continuity enterprise inquiry where there is a sale of corporate assets. *Turner* went on to identify as a separate and relevant inquiry whether a purchasing corporation holds itself out as the effective continuation of the seller.

[7] In *Haney v Bendix Corp*, 88 Mich App 747; 279 NW2d 544 (1979), the Court of Appeals found that summary judgment for the defendant, a tertiary successor, was properly denied. In *Haney*, the plaintiff had estab-

Although in the appropriate case a tertiary successor might be liable for a manufacturer's defective product, we conclude, on the basis of our interpretation of *Turner*, that this is not such a case.

This case illustrates the limits of *Turner*'s applicability. *Turner*'s holding indicates that the "continuity of enterprise" doctrine applies only when the transferor is no longer viable and capable of being sued:

> In our analysis of the matter we must conclude at this point that in a products liability case where the corporation fabricating the injury-producing item changes corporate structure before injury and suit, as a matter of policy neither the victim nor the successor corporation has a different interest vis-à-vis the suit whatever the type of corporate metamorphosis—merger, de facto merger, or sale of assets for cash—*so long as the transferor corporation becomes defunct.* [*Id.* at 429 (emphasis added).][8]

The thrust of the decision in *Turner* was to provide a remedy to an injured plaintiff in those cases in which the first corporation "legally and/or practically becomes defunct." *Turner, supra* at 419. Thus, the

---

lished that approximately ninety percent of the production force, ninety percent of the sales force, and fifty percent of the management from the manufacturer remained with the tertiary successor. Further, the defendant took over what had been the manufacturer's entire plant facilities, equipment, machinery, inventory and patents. We note that *Haney* is overruled to the extent that it is inconsistent with our holding that the availability of a predecessor is fatal to actions for successor liability.

[8] See also *Santa Maria v Owens-Illinois, Inc*, 808 F2d 848, 859 (CA 1, 1986) (interpreting *Turner* as requiring that the injured plaintiff has been "deprived by the asset transaction of an effective remedy against the predecessor corporation that actively manufactured the product causing the injury"); *Diaz v South Bend Lathe, Inc*, 707 F Supp 97, 102-103 (ED NY, 1989) (refusing to apply *Turner* because predecessor corporation remained in existence); *McCarthy v Litton Industries*, 410 Mass 15, 22; 570 NE2d 1008 (1991) (interpreting *Turner* as requiring dissolution of the predecessor corporation).

*Turner* Court reasoned that "distinctions between types of corporate transfers are wholly unmeaningful" because the injured plaintiff "has no place to turn for relief except to the second corporation." *Id.* The underlying rationale for the *Turner* Court's decision to disregard traditional corporate law principles was to provide a source of recovery for injured plaintiffs.

Pneumo Dynamics, now Pneumo Abex, continued on as an active corporation after the transaction with Cone-Blanchard. While failure of the predecessor to dissolve may not be fatal in every action for successor liability, especially, for example, where the predecessor continues as a shell or is otherwise underfunded, the fact that a predecessor remains a viable source for recourse is. Certainly, where a plaintiff has in fact successfully pursued a remedy against a predecessor, the policy concerns that underscored the adoption of the continuity of enterprise theory in *Turner* simply are not present. Here, in light of the availability of Pneumo Abex to suit as evidence by plaintiff's $500,000 settlement with Pneumo Abex, *Turner* is inapplicable.

III

DUTY TO WARN

This Court has not previously addressed whether a successor corporation has an independent duty to warn a third party of a predecessor's negligently designed and manufactured product.[9] Generally, "an

---

[9] The Court of Appeals has concluded that a successor may be liable for negligence stemming from an independent duty to warn in *Powers v Baker-Perkins, Inc*, 92 Mich App 645; 285 NW2d 402 (1979), and in *Pelc v*

individual has no duty to protect another who is endangered by a third person's conduct." *Murdock v Higgins*, 454 Mich 46, 54; 559 NW2d 639 (1997).

Whether a duty exists is a question of law.

> In determining whether to impose a duty, this Court evaluates factors such as: the relationship of the parties, the foreseeability of the harm, the burden on the defendant, and the nature of the risk presented. [*Id.* at 53.]

We conclude that in certain circumstances a successor may have an independent duty to warn a predecessor's customer of defects in a predecessor's product.

Consistent with general negligence principles, a successor corporation's duty to warn a predecessor's customer of the predecessor's negligence requires a " 'special relationship' either between the defendant and the victim, or the defendant and the third party who caused the injury." *Id.* at 54. The mere status of a defendant as a successor corporation is insufficient to create a duty to warn. See *Polius v Clark Equipment Co*, 802 F2d 75, 84 (CA 3, 1986). Relevant indicia of a "special relationship" include: a successor's actual or

---

*Bendix Machine Tool Corp*, 111 Mich App 343; 314 NW2d 614 (1981). In *Powers*, the Court of Appeals held that an independent ground for successor liability could be found where

> some control over the product is given to the successor, as in servicing, or the successor becomes aware of a defect in the product, causing an assumption of liability by the successor for injuries thereafter caused by that product. [*Id.* at 662-663.]

In *Pelc* the Court of Appeals applied the principles outlined by *Powers*, declining to find a duty to warn where a successor corporation had not serviced or exercised any control over the machine in question and had not been aware of any defect in the machine before the plaintiff's injury. *Pelc, supra* at 358.

constructive knowledge of a defect in its predecessor's product, a continuing relationship with the predecessor's customer, service agreements between the successor and the predecessor's customer relating to the machine in question, and evidence that the successor had actually serviced the machine in question. A successor's awareness of the location or present owner of a defective product is a logical predicate to liability. See *Travis v Harris Corp*, 565 F2d 443, 449 (CA 7, 1977) (without knowledge of the machine's current location the successor has no one to warn).

Plaintiff contends that existence of *Flaugher v Cone Automatic Machine Co*, 30 Ohio St 3d 60, 67; 507 NE2d 331 (1987), and a 1979 Texas lawsuit cited by the *Flaugher* case alleging similar injuries caused by Conomatic machines supports a finding that Cone-Blanchard had actual or constructive knowledge of the alleged defect in the design of the Conomatic feed screw machine. While earlier lawsuits involving similar products and similar injuries might conceivably be sufficient to inform a successor of a defective product, *Flaugher* was summarily dismissed, and it was never established that the Conomatic product involved in that case was defective. Similarly, plaintiff presented no evidence that the machine involved in the Texas lawsuit was deemed defective. For these reasons, we conclude plaintiff cannot rely on the *Flaugher* and Texas cases as evidence of Cone-Blanchard's actual or constructive knowledge of a defect in the particular machine at issue in this case.

As to a "special relationship" with Cone I's customers, there is no evidence that Cone-Blanchard actually or by agreement serviced the machine in question. Plaintiff was able to establish that Cone-Blanchard

had access to Cone I's customer lists and that her employer possessed a Cone-Blanchard business card on its premises. We conclude that while Cone-Blanchard may have solicited continuing business from Cone I's customers, such evidence alone is insufficient to support a "special relationship."

For these reasons we find that Cone-Blanchard did not have a duty to warn of alleged defects in the machine at issue in this case.

IV

CONCLUSION

We hold that *Turner*'s continuity of enterprise theory is inapplicable to the facts of this case: plaintiff has successfully pursued a remedy against Cone-Blanchard's predecessor. We further hold that the plaintiff has not established a genuine issue of material fact concerning whether defendant breached a duty to warn of the alleged defect in the Conomatic feed screw machine operated by plaintiff. Consequently, we reverse the decision of the Court of Appeals.

TAYLOR, CORRIGAN, and YOUNG, JJ., concurred with WEAVER, C.J.

BRICKLEY, J. (*dissenting*). Because I disagree both with the majority's interpretation of the relevant law, and with its view of the facts in the record, I respectfully dissent.

I

Contrary to the majority, I believe that the successor liability issue in this case is controlled by *Turner v Bituminous Casualty Co*, 397 Mich 406; 244 NW2d 873 (1976). In *Turner*, this Court stated that "there may be a cause of action [for the plaintiff] where the totality of the transaction demonstrates a basic continuity of the enterprise." *Id.* at 411. This statement demonstrates that *Turner's* continuity of enterprise doctrine does not simply seek to guarantee that the plaintiff has some source of recovery, nor is it based on principles of strict liability, as the majority apparently believes. Indeed, *Turner* has nothing to do with determining whether an injury was negligently inflicted. Rather, the test in *Turner* is designed to determine whether the company (or "enterprise") involved in the lawsuit is essentially the same company that was allegedly negligent in designing or manufacturing the offending product.

In making this determination, the *Turner* Court recognized that a corporation is susceptible to changes in ownership and structure that simply cannot occur in the life of a human tortfeasor.[1] *Id.* at 419-420. Thus, the *Turner* Court eschewed reliance upon the legal

---

[1] Corporations can be merged, spun-off, and otherwise sold in a variety of ways. If the corporation is sold as a going concern, however, it continues to exist as the same enterprise in a relevant sense. For example, if a wholly owned subsidiary of a large corporation manufactured a defective product in 1943 which injured someone in 1999, that subsidiary would remain potentially liable for the injury. But, if in the interim, the subsidiary had been bought and sold several times, and still continued as a wholly owned subsidiary of a different large corporation, is it any less "at fault" for the defective product that it manufactured? Is the subsidiary any less "at fault" if it merges with a large corporation, becoming an independent division that continues to operate as it always had? Is this any different from a small independent corporation that becomes an independent

formalities of corporation law, and sought to determine, by examining the relevant criteria, whether the corporate defendant was, in essence, a continuation of the corporation that was allegedly negligent in designing or manufacturing the product at issue, or whether it was a stranger to the allegedly negligent corporation. *Id.* at 423-424, quoting *Ray v Alad Corp*, 55 Cal App 3d 855; 127 Cal Rptr 817, 820 (1976) ("does a manufacturer's responsibility for its defective products survive a change in ownership, where the manufacturing business, as such, maintains its identity and continues to operate as before 'at the same old stand' ").[2]

We explained that the policy basis of this "continuity of the enterprise" requirement " 'is that the enterprise, the going concern, ought to bear the liability for the damages done by its defective products.' " *Turner, supra* at 414, quoting *Shannon v Samuel Langston Co*, 379 F Supp 797, 802 (WD Mich, 1974). We also reasoned that such an enterprise enjoys certain continuing benefits, such as goodwill and expertise, and therefore must also accept continuing responsibility for the costs that the enterprise has imposed on society through its negligence. *Turner* at 425.

This reasoning is not inconsistent with our insistence upon fault-based products liability theory in *Prentis v Yale Mfg Co*, 421 Mich 670, 681; 365 NW2d

---

division of one large corporation, and then another, as long as the enterprise continues to operate "at the same old stand"?

[2] The *Alad* case was vacated by the California Supreme Court after our opinion in *Turner* was issued. 19 Cal 3d 22; 136 Cal Rptr 574; 560 P2d 3 (1977). Regardless, the quoted language is a clear statement of the issue presented.

176 (1985), where we stated that "[w]hen the societal goal of holding manufacturers accountable for the safety of their products has been threatened by the interposition of technical rules of law, it has been the rules that have gradually given way." While it would be an aggressive version of strict liability that would hold a corporation liable for injuries caused by the defective product of a different corporation, *Turner* sought to answer a different question altogether: whether the defendant corporation was the same enterprise as the allegedly offending corporation, or a corporate stranger.

The traditional rule of successor liability arose from technical rules of law "developed not in response to products liability problems, but largely in the areas of creditors' protection, . . . and of tax assessments, . . . or, in the case of the de facto merger, in the context of shareholder rights." *Turner, supra* at 418. In *Turner*, we rejected reliance on these technical rules when deciding whether a defendant enterprise was, as a matter of practical fact, a mere continuation of the allegedly negligent enterprise. *Id.* at 426 ("[T]o say Old Sheridan is a stranger to New Sheridan, and vice versa, is to honor form over substance. . . . Continuity is the purpose, continuity is the watchword, continuity is the fact").

For these reasons, I cannot agree with the majority that *Turner*'s applicability depends on whether there has already been a recovery in the case in question. Nor can I agree that *Turner*'s reasoning was based on notions of strict liability. While many of the cases that *Turner* cited were strict liability cases, *Turner*'s central rationale is consistent with this Court's observation that "[w]hen the societal goal of holding manu-

facturers accountable for the safety of their products has been threatened by the interposition of technical rules of law, it has been the rules that have gradually given way." *Prentis, supra* at 681.

Because the question presented in this case is *who* is responsible for the alleged negligence, rather than *whether* there actually was negligence, I would hold that *Turner's* continuity of the enterprise test is the controlling test in this case.

II

The Court in *Turner* adopted the following guidelines to determine if there was sufficient continuity between a successor corporation and its predecessor to justify imposing liability on the successor. "If there is such continuity, then the transferee must accept the liability with the benefits." *Turner, supra* at 430. These guidelines examine whether:

> "(1) There is a continuation of the enterprise of the seller corporation, so that there is a continuity of management, personnel, physical location, assets, and general business operations.

> \*    \*    \*

> "[2] The seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practically possible.

> "[3] The purchasing corporation assumes those liabilities and obligations of the seller ordinarily necessary for the uninterrupted continuation of normal business operations of the seller corporation." [*Id.* at 420, quoting *Shannon, supra* at 801, in turn citing *McKee v Harris-Seybold Co, Div of Harris-Intertype Corp*, 109 NJ Super 555, 563-567; 264 A2d 98 (1970), aff'd 118 NJ Super 480; 288 A2d 585 (1972).]

The *Turner* Court included one additional factor: whether "[t]he purchasing corporation held itself out to the world as the effective continuation of the seller corporation." *Id.* at 430. Application of these guidelines to the evidence before the Court demonstrates that numerous questions of material fact remain for decision by a jury.

The first factor examines whether Pneumo Dynamics and Cone-Blanchard "continu[ed] the enterprise of the seller corporation." The sales contract shows that when Cone-Blanchard bought Pneumo's machine tool division in 1972, it took over what had been Cone I's "entire plant facilities, equipment, machinery, inventory and patents."

The sales contract lists all Cone I's assets that Pneumo sold to Cone-Blanchard. These assets include, among other things, accounts receivable, raw materials and other inventory, machinery, equipment, tools, real property, trademarks and patents, leases, customer books, and files and records. Furthermore, Cone-Blanchard assumed all the contracts with unionized employees serving Cone I's plant. It assumed the obligations of Pneumo's hourly and salaried employee pension programs, expressly granting employees pension credit for time served under both Pneumo and Cone I. While the contract does not expressly provide for retention of "management" personnel, it is a reasonable inference that the "salaried employees" include management employees. A jury could find on these facts that Cone-Blanchard purchased Cone I from Pneumo as a continuing enterprise.

The second criterion examines whether "[t]he seller corporation ceases its ordinary business operations, liquidates, and dissolves as soon as legally and practi-

cally possible." *Id.* at 420. Pneumo has neither liqui-
dated nor dissolved, but, under the facts of this case,
this criterion is irrelevant to determining whether
Cone-Blanchard purchased Cone I from Pneumo as a
going concern. Pneumo sold its entire machine divi-
sion to Cone-Blanchard, and executed a covenant not
to compete "anywhere in the world in the manufac-
ture, sale or service of, machines or parts of a nature
similar to those manufactured, serviced or sold by the
Machine Tool Group at any time on or before the
Closing Date [of the sale to Cone-Blanchard]." For all
practical purposes, Pneumo has "liquidated and dis-
solved" in the relevant industry and sold its Machine
Tool Group and Cone I as a fully operational continu-
ing enterprise.

The third criterion examines whether the "purchas-
ing corporation assumes those liabilities and obliga-
tions of the seller ordinarily necessary for the uninter-
rupted continuation of normal business operations of
the seller corporation." *Turner, supra* at 420. In the
contract of sale between Cone-Blanchard and
Pneumo, Cone-Blanchard expressly assumed "liabili-
ties incurred . . . in the ordinary course of business
in operating the Business," "obligations and liabili-
ties . . . under all open sales contracts and purchase
contracts," and "obligations and liabilities . . . under
all other contracts, plans, agreements and commit-
ments," such as labor, pension, and insurance agree-
ments. Unquestionably, these are the types of contin-
uing liabilities and obligations a buyer must assume if
the purchased corporation is to be operated as a
going concern. Cone-Blanchard's assumption of the
liabilities and obligations of Pneumo's machine tool
group, as well as Pneumo's complete exit from the

machine tool industry, as evidenced by the covenant not to compete, shows that Cone-Blanchard did buy this division of Pneumo as a continuing business enterprise.

The fourth factor, whether the purchasing corporation holds itself out as "the effective continuation of the seller corporation," merits little discussion. By its very name and the name of its product, it is clear that Cone-Blanchard capitalizes on the Cone name. The evidence shows that Pneumo did so, as well: not only did it use Cone I's product trade name (Conomatic), but it also continued to use the original company's corporate trade name, describing it in a product manual as the Cone Automatic Machine Company: A Division of Pneumo Dynamics Corporation.

There are numerous triable questions of material fact regarding whether Cone-Blanchard is the corporate successor of Cone I. The Court of Appeals should be affirmed with respect to this issue.

III

The majority holds that a successor corporation may have an independent duty to warn of defects in its predecessor's products, where there is a "special relationship" between the defendant and the victim or the defendant and the third party who caused the injury. *Ante*, pp 706-707, quoting *Murdock v Higgins*, 454 Mich 46, 54; 559 NW2d 639 (1997). According to the majority, the

> [r]elevant indicia of a "special relationship" include: a successor's actual or constructive knowledge of a defect in its predecessor's product, a continuing relationship with the predecessor's customer, service agreements between the successor and the predecessor's customer relating to the

machine in question, and evidence that the successor had actually serviced the machine in question. [*Ante*, pp 707-708.]

Under the majority's test, drawing all reasonable inferences from the given evidence in the plaintiff's favor, Cone-Blanchard had an independent duty to warn.

The majority, however, dismisses the plaintiff's claims that the defendant had constructive knowledge of the defect in the machine that injured the plaintiff. The plaintiff alleged that in two previous lawsuits against Cone-Blanchard, one in 1979 and one in 1982, an individual sued after being scalped by a Conomatic Feed Screw Machine. These cases involved the same type of machines and the same type of injury as are involved in the instant case. The majority asserts, however, that in neither case was the machine proved to be defective. Therefore, the defendant had no constructive knowledge of any defect in the machine in question. *Id.*, p 708.

In so holding, the majority fails to observe the proper standard for judging evidence on a summary judgment motion. From the fact of these two lawsuits, a jury could reasonably find that the defendant had knowledge that these machines might cause this injury. Giving the plaintiff the benefit of all reasonable inferences, two lawsuits alleging the same injury from the same machine are sufficient notice to the defendant that there may be a defect in that type of machine, worth investigating further. "If one by exercise of reasonable care would have known a fact, he is deemed to have had constructive knowledge of such fact . . . ." Black's Law Dictionary (6th ed), p 314. A jury could reasonably find that the defend-

ant, "by exercise of reasonable care," would have known of the alleged defect.[3]

With respect to Cone-Blanchard's contact with the owner of the machine that injured the plaintiff, the majority again fails to look at the evidence in a light most favorable to the plaintiff, and fails to draw reasonable inferences in the plaintiff's favor. The majority acknowledges that "Cone-Blanchard had access to Cone I's customer lists and that [plaintiff's] employer possessed a Cone-Blanchard business card on its premises," but states that "while Cone-Blanchard may have solicited continuing business from Cone I's customers, such evidence alone is insufficient to support a 'special relationship.' " *Ante*, pp 708-709.

To infer from this evidence that Cone-Blanchard was merely "soliciting" business from the plaintiff's employer is an inference from the evidence in favor of the defendant, which is not proper on summary disposition. *Chandler v Dowell Schlumberger Inc*, 456 Mich 395, 397; 572 NW2d 210 (1998). A jury could reasonably find, from the evidence acknowledged by the majority, that an agent of Cone-Blanchard had specifically examined the machine in question and had a "special relationship" with the plaintiff's employer, whether or not the purpose of that relationship was solicitation.

A jury could reasonably find from the evidence before the Court that Cone-Blanchard had construc-

---

[3] According to the majority's theory, a successor defendant would never have constructive notice of a defect in its predecessor's product. Such cases would always be dismissed on summary disposition, and therefore the allegations of injury would never give notice to the defendant to investigate the potential problem. The number of injuries allegedly caused by the defect is irrelevant to the majority.

tive knowledge of a defect in its predecessor's machine, and that it had been in contact with the plaintiff's employer about the machine in question. Whether this contact was for purposes of inspection, repair, or replacement is purely speculative, and this Court may not speculate in favor of the defendant in reviewing this motion for summary disposition. *Chandler, supra.* This evidence presents material questions of fact regarding whether Cone-Blanchard had a duty to warn.

IV

The *Turner* test is applicable to the facts of the instant case, and under that test, the evidence presented by the plaintiff is more than adequate to go to a jury regarding whether Cone-Blanchard is a corporate successor to Cone I. The plaintiff has also submitted evidence sufficient to raise questions of fact regarding whether Cone-Blanchard had a duty to warn the plaintiff of the dangers presented by the machine in question. For these reasons, I respectfully dissent, and would affirm the judgment of the Court of Appeals.

CAVANAGH and KELLY, JJ., concurred with BRICKLEY, J.