Christine **KEMPER**, Plaintiff,

v.

**SALINE LECTRONICS,**
et al., Defendant.

No. 3:03CV7470.

United States District Court,
N.D. Ohio,
Western Division.

April 27, 2005.

Mark A. Davis, Toledo, OH, for Plaintiff.

George S. Fish, Southfield, MI, Kathleen W. Kolodgy, Toledo, OH, for Defendants.

### MEMORANDUM OPINION

KATZ, District Judge.

This matter is before the Court on Plaintiff's Motion for Summary Judgment

as to Successor Liability to a Sum Certain (Doc. No. 74). Also before the Court is Defendant's Cross–Motion for Summary Judgment and Memorandum in Opposition to Plaintiff's Motion for Summary Judgment (Doc. No. 75). Plaintiff has filed a response to Defendant's motion for summary judgment and reply regarding its own motion (Doc. No. 80), and Defendant has filed a reply (Doc. No. 82). Also before the Court are Defendant's Motion to Strike Affidavits (Doc. No. 81), to which Plaintiff has filed a response (Doc. No. 87), and Plaintiff's Motion to Determine Spoliation by Defendant and Request for Hearing (Doc. No. 88), to which Defendant has filed a response (Doc. No. 92). For the following reasons, Plaintiff's Motion for Summary Judgment and Motion to Determine Spoliation, and Defendant's Motion to Strike are denied. Defendant's motion for Summary Judgment is granted.

### BACKGROUND

Plaintiff Christine Kemper ("Kemper") claims Defendant Saline Lectronics ("Saline") is liable to her for money she loaned to another company, LH Manufacturing d/b/a/ Q-tronics ("Q-tronics"), under a theory of successor liability.

In December of 2000, Kemper made a $100,000 unsecured loan to Q–Tronics, in reliance on allegedly fraudulent representations made by her ex-husband and Q-tronics' ex-president, Ted Ralston ("Ralston"). Ralston gave Kemper a promissory note he had signed in his capacity as president of Q-tronics and upon which he had forged the signature of Steve Kasper, a Q-tronics director. Ralston also personally guaranteed the loan, but has since filed for bankruptcy. In early 2002, the directors of Q-tronics discovered that Ralston had not kept accurate books and had misrepresented Q-tronics' financial state. In February 2002, they fired Ralston as president and, in April of 2002, hired a consultant, Mario Sciberras ("Sciberras"), to try to salvage Q-tronics. At the time Sciberras was hired, Defendant claims Q-tronics was insolvent. Q-tronics paid Kemper $20,000 of the money it owed her, and attempted to pay another $40,000 with a check that was returned for insufficient funds.

By late 2001, two individuals involved with Q-tronics, Amherst Turner ("Turner") and John O'Neill ("O'Neill"),[1] had loaned Q-tronics $1 million and $600,000, respectively, in exchange for promissory notes, a ten percent equity interest each, and security interests in Q-tronics' assets. Turner's and O'Neill's security interests were subordinate to a security interest in Q-tronics' assets held by Standard Federal Bank, to which Q-tronics owed $250,000.

Defendant claims Q-tronics defaulted on its loan to Standard Federal in August of 2002. O'Neill then assumed Standard Federal's promissory note in exchange for $235,000. Standard Federal executed a bill of sale and a surrender and release, leaving Turner and O'Neill as Q-tronics' only secured lenders. "[D]ue to significant defaults in excess of six months," Turner and O'Neill foreclosed on the Q-tronics assets, which they claim were insufficient to cover the total $1.85 million debt the assets secured. (Doc. No. 75, Ex. 1).

Turner and O'Neill then formed Saline and sold it the assets on which they had foreclosed. They claim the assets were independently appraised by a third party and that Saline paid fair consideration for

---

**1.** The evidence indicates O'Neill may have participated in relevant transactions through an entity called the O'Neill Family LLC. However, for the sake of convenience, and because the parties have often done so in their memoranda, the Court will refer to O'Neill individually.

them. . Saline began operating out of the same building as had Q-tronics, with mostly the same employees, making the same products, printed circuit boards. However, Turner and O'Neill each owned fifty percent of the shares in Saline, whereas they had owned a combined twenty-two percent of Q-tronics, which was also owned by twelve other people, including Ralston. Ralston owned thirty-four percent of Q-tronics' stock, though Plaintiff claims Ralston's shareholder voting rights transferred to O'Neill when Q-tronics fired Ralston in February of 2002.

Plaintiff sued Saline, Q-tronics, Turner, O'Neill, the O'Neill Family LLC, Sciberras, and several other individuals associated with both companies. The Court granted Kemper's motion for a default judgment against Q-tronics (Doc. No. 36), and dismissed the claims against the individual defendants for lack of personal jurisdiction (Doc. No. 70). Kemper and Saline have now filed cross-motions for summary judgment on the issue of successor liability.

### DISCUSSION

#### A. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED.R.CIV.P. 56(c). The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The

movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25, 106 S.Ct. 2548. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986) (*quoting* FED.R.CIV.P. 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir.2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the non-moving party." *Williams v. Belknap*, 154 F.Supp.2d 1069, 1071 (E.D.Mich.2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir.1987)). However, " 'at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter,' " *Wiley v. U.S.*, 20 F.3d 222, 227

(6th Cir.1994) (quoting *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505); therefore, "[t]he Court is not required or permitted ... to judge the evidence or make findings of fact." *Williams*, 154 F.Supp.2d at 1071. The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F.Supp.2d 928, 930 (S.D.Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir.2000).

### B. Successor Liability

#### 1. Nature of the Transaction

Defendant's evidence showing that Turner and O'Neill foreclosed on Q-tronics' assets and then sold them for cash to Saline is uncontroverted. For the purposes of the successor liability inquiry, courts generally treat such a series of events as a cash-for-assets sale, despite the intervening foreclosure. *See, e.g., Ed Peters Jewelry Co. v. C & J Jewelry Co.*, 124 F.3d 252, 268 (1st Cir.1997) (holding that if the Defendant was otherwise qualified as a "successor" under relevant state law, "there would be no equitable basis for treating the asset transfer by foreclosure differently than a direct transfer" from the predecessor to the successor); *Dixstar v. Gentec Equip.*, No. 3:02CV–45–H, 2004 U.S. Dist. LEXIS 7201, at *17 (W.D.Ky. Feb. 13, 2004) (noting that relevant reported cases "appear to assume that an intermediate sale does *not* preclude successor liability."); *Glynwed, Inc. v. Plastimatic, Inc.*, 869 F.Supp. 265, 275 (D.N.J.1994).

Courts have advanced several reasons for this. The first is that successor liability is an equitable doctrine and "equity is loath to elevate the form of the transfer over its substance...." *Ed Peters*, 124 F.3d at 268. A Sixth Circuit case predating the merger of law and equity in the federal courts supports this conclusion. *See Armour v. E. Bement's Sons*, 123 F. 56 (6th Cir.1903). In *Armour* the court found successor liability impossible where the assets of the predecessor company had been foreclosed upon and sold to a new company with ownership identical to the first, but noted:

> Sometimes peculiar circumstances arise in the succession of corporate organizations in which the powers of a court of equity may be properly invoked to work out the rights of parties. In such cases, if justice requires it, the court will look beyond matters of form, and treat the corporation as an association of individuals, and, on bringing the parties before it, may administer equitable rights as the nature of the case may require. But a court of law, which recognizes a corporation only as a distinct entity, and must proceed upon strictly legal methods, has not the means, and is not therefore the proper forum in which, to investigate and adjudge such matters.

*Id.* at 59–60.

The second reason is that: "by its very nature the foreclosure process cannot preempt the successor liability inquiry." *Id.* at 267. This is because, while the foreclosure may wipe out subordinate liens on the same collateral, it will not extinguish the predecessor's underlying debt, secured or unsecured, and successor liability focuses on whether the new company is really the old company "in disguise" and should therefore be liable for the old company's unextinguished debts. *Id.* Finally, "[s]ubstance must be elevated over form in

... successor liability cases because 'otherwise, unscrupulous business persons would be able to avoid successor liability and cheat creditors merely by changing the form of the transfer.'" *Dixstar*, 2004 U.S. Dist. LEXIS at *15 (quoting *Stoumbos v. Kilimnik*, 988 F.2d 949, 961 (9th Cir.1993)). The Court will therefore treat the foreclosure and sale to Saline as a cash-for-assets transaction.

### 2. Successor Liability Analysis

■■■ While the successor corporation generally assumes the predecessor's liabilities when *stock* is exchanged for assets, when the acquiring corporation purchases assets for *cash*, the Michigan Supreme Court [2] holds that the purchaser assumes the selling corporation's liabilities only:

(1) where there is an express or implied assumption of liability; (2) where the transaction amounts to a consolidation or merger; (3) where the transaction was fraudulent; (4) where some of the elements of a purchase in good faith were lacking, or where the transfer was without consideration and the creditors of the transferor were not provided for; or (5) where the transferee corporation was a mere continuation or reincarnation of the old corporation.

*Craig v. Oakwood Hosp.*, 471 Mich. 67, 684 N.W.2d 296, 314 (2004) (citing to *Turner v. Bituminous Cas. Co.*, 397 Mich. 406, 419–20, 244 N.W.2d 873 (1976) and *Foster v. Cone–Blanchard Machine Co.*, 460 Mich. 696, 597 N.W.2d 506, 510 (1999)). The Ohio Supreme Court similarly holds that:

[A] corporation that purchases the assets of another corporation is not liable for the contractual liabilities of its predecessor corporation unless (1) the buyer expressly or impliedly agrees to assume such liability; (2) the transaction amounts to a de facto consolidation or merger; (3) the buyer corporation is merely a continuation of the seller corporation; or (4) the transaction is entered into fraudulently for the purpose of escaping liability.

*Welco Indus., Inc. v. Applied Cos.*, 67 Ohio St.3d 344, 617 N.E.2d 1129, 1133 (1993) (citing to *Flaugher v. Cone Automatic Mach. Co.*, 30 Ohio St.3d 60, 507 N.E.2d 331, 334 (1987)). Plaintiff cannot show that any of the exceptions to the general rule that successor liability will not attach following a cash-for-assets transaction apply in this case.

### a. Express or Implied Assumption of Liability

Plaintiff states in her motion for summary judgment that she does not claim Saline expressly or impliedly assumed Q-tronics' liability, noting that "the first exception does not apply." (Doc. No. 74, p. 12).

### b. De Facto Merger

■■ Neither the Michigan Supreme Court nor the Ohio Supreme Court will find that a de facto merger exists unless:

There is a continuity of shareholders which results from the purchasing corporation *paying for the acquired assets with shares of its own stock*, this stock

---

**2.** Though Kemper cites to both the successor liability law of Michigan and Ohio in her motion for summary judgment, she argues in her response and reply that Michigan law applies because the two companies at issue are both Michigan corporations and the foreclosure and asset sale occurred in Michigan. Saline argues that the law of Ohio applies because the loan agreement Kemper sues under was executed in Ohio, and that, in any event, the law of Michigan and Ohio is the same in successor liability cases outside the products-liability arena. Because the Court agrees with Saline that the result under either state's law would be the same, the Court need not determine which state's law applies.

ultimately coming to be held by the shareholders of the seller corporation so that they become a constituent part of the purchasing corporation.

*Craig,* 684 N.W.2d at 314–15 (emphasis added); *see also Welco,* 617 N.E.2d at 1134 (calling "a continuity of shareholders resulting from a sale of assets in exchange for stock" a "hallmark" of a de facto merger, and noting that "[o]ne court has indicated that a transfer of assets for stock is the sine qua non of a de facto merger") (*citing Travis v. Harris Corp.,* 565 F.2d 443, 447 (7th Cir.1977)).

█ Plaintiff has identified no evidence showing that shareholders of Q-tronics received Saline stock as part of a stock-for-assets transaction. Plaintiff claims that O'Neill admitted in his affidavit that, in Plaintiff's words, "the merger was an exchange of stock," because Turner and O'Neill "had cashed in their loan positions for stock and became [sic] directors." (Doc. No. 80, p. 11). However, O'Neill's affidavit does not support Plaintiff's assertion that stock was exchanged, for two reasons. First, Plaintiff mischaracterizes O'Neill's statement, in which he merely indicates that Turner and O'Neill each received a ten-percent interest in Q-tronics in partial consideration for the loans they made to the company, in addition to the promissory notes and security interests they received. Second, the statement in no way shows that Q-tronics' shareholders received any Saline stock. Plaintiff, therefore, cannot establish that a de facto merger occurred.

### c. *Fraudulent Transaction, Lack of Good Faith Purchase, and Lack of Consideration*

█ Likewise, Plaintiff has identified no evidence showing that the foreclosure by Turner and O'Neill or the subsequent asset sale to Saline were fraudulent, that elements of a purchase in good faith were lacking, or that the transaction was without consideration.

The third and fourth considerations in Michigan's formulation of the successor liability analysis—whether "the transaction was fraudulent" and whether "some of the elements of a purchase in good faith were lacking, or [whether] the transfer was without consideration and the creditors of the transferor were not provided for"— appear to overlap, as "indicia of fraud may be inadequate consideration paid to the transferor, and/or lack of good faith." *Turner,* 244 N.W.2d at 887 (Coleman, J., dissenting); *accord Welco,* 617 N.E.2d at 1134 (citing Judge Coleman's dissent in *Turner*).

In support of her contention that the transaction was entered into fraudulently for the purpose of escaping liability, Plaintiff makes several arguments unrelated to the conduct of the relevant transactions. First, Plaintiff points to the fraud committed by Ralston in inducing Plaintiff to make the loan in the first place. However, Plaintiff cannot use evidence of Ralston's fraud to demonstrate that the subsequent foreclosure and asset sale were somehow fraudulent. Plaintiff also claims that Turner, O'Neill, and Sciberras "pretended that Standard Federal foreclosed on their loan, when in truth O'Neill had purchased Standard Federal's position." (Doc. No. 74, p. 18). However, Plaintiff presents no evidence showing that anyone made a representation to her or to anyone else that Standard Federal, and not Turner and O'Neill, foreclosed on the Q-tronics assets.

Next, Plaintiff claims that Saline's use of a different street address than that used by Q-tronics, though the two companies operated out of the same building, and the alleged post-sale destruction of Q-tronics records by Saline both indicate that the transactions were fraudulent. The Court

fails to see how the change of address or the post-transaction destruction of records show that the foreclosure or asset sale transactions themselves were conducted fraudulently.

Finally, Plaintiff claims that Sciberras fraudulently asserted that Saline did not assume any Q-tronics liabilities, though Plaintiff has presented evidence showing that Saline did pay off a Q-tronics debt to a key supplier, and that this indicates the transactions were fraudulent. Like the address change and the destruction of records, Plaintiff's evidence that Saline paid a Q-tronics debt in order to keep doing business and that Sciberras misrepresented that Saline made no such payment does not bear on whether the foreclosure and asset sale transactions lacked legitimacy.

Plaintiff also attacks the transactions themselves. First, Plaintiff asserts that the documents associated with the foreclosure and asset sale "are improper and have inconsistencies." However, Plaintiff has failed to identify what about these documents is improper, referring the Court to an almost thirty-five-page-long section of Turner's deposition in which Plaintiff's counsel questions Turner about the lack of signatures and dates on copies of the relevant documents that Turner himself had in his position and brought to his deposition. (Doc. No. 74, Ex. B., p. 47 ("Q.: But these are the documents that you've produced to me today, right? A.: Yes.")). Nowhere in the cited pages does Turner admit or indicate that any of the actual documents associated with the transactions were in any way improper.

Finally, Plaintiff claims that the August 2002 foreclosure by Turner and O'Neill was fraudulent because Q-tronics was not then insolvent and because Turner and O'Neill were not the first-priority lienholders. In support of these arguments, Plaintiff points to copies of Q-tronics financial statements from December 2001 and January 2002 that she claims show that Q-tronics was solvent at that time and that Turner and O'Neill's debt was subordinated. However, even if Q-tronics was solvent in January of 2002, Plaintiff's evidence fails to show that Q-tronics did not default on its secured loans in August of 2002. Moreover, the fact that Turner and O'Neill's loans were subordinate to that of Standard Federal in January of 2002 is irrelevant: O'Neill subsequently assumed Standard Federal's promissory note. The financial statement does not indicate that Turner's and O'Neill's loans were unsecured or were subordinate to any specific loans. Nor does the financial statement indicate what the value of Q-tronics' assets were in August of 2002, when Turner and O'Neill foreclosed.

In short, none of the evidence identified by Plaintiff may be used to show that the August 2002 foreclosure by Turner and O'Neill was improper or made in bad faith, or that the consideration Saline subsequently paid to Turner and O'Neill was inadequate. Therefore, Plaintiff cannot show that the third and fourth *Turner* and the equivalent *Welco* exceptions apply.

#### d. "Mere Continuation"

Courts have applied two different tests to determine whether a purchasing company is a "mere continuation" of the selling company. The "traditional mere continuation" test focuses on "the continuation of the corporate entity, not the business operation, after the transaction." *Welco*, 617 N.E.2d at 1134. Under the "traditional" test, a purchasing company is a "mere continuation" of the selling company only where the same people own both corporations. *Turner*, 244 N.W.2d at 892, 894 (Coleman, J., dissenting) (noting that the traditional test, which the *Turner* majority expands for products liability cases, en-

compasses situations where "one corporation sells its assets to another corporation with the same people owning both corporations," and calling the standard that the majority expanded from "identical ownership"); *Welco,* 617 N.E.2d at 1134 (quoting Judge Coleman's dissent in *Turner* ). By contrast, the "expanded mere continuation" test focuses on whether, irrespective of ownership, there has been a continuation of the enterprise—that is, whether there was " 'a continuity of management, personnel, physical location, assets, and general business operations.' " *Turner,* 244 N.W.2d at 879, 883 (adopting in a products liability case a continuity of enterprise test using factors set out in another court's formulation of the de facto merger test) (quoting *Shannon v. Samuel Langston Co.,* 379 F.Supp. 797, 801 (W.D.Mich.1974) (internal quotation omitted)).

Ohio has not adopted the expanded test, *Welco,* 617 N.E.2d at 1134, and it applies in Michigan only in products-liability cases. *City Mgmt. Corp. v. U.S. Chem. Co.,* 43 F.3d 244, 252–53 (6th Cir.1994) (concluding, in light of the reasoning, structure, and language of *Turner,* "that the Michigan Supreme Court intended that the continuing enterprise exception be limited to products liability cases . . . ."); *Turner,* 244 N.W.2d at 881, (calling its expansion the "Products Liability Continuity Principle," and stating that a list including the expanded factors made out a prima facie case of successor liability "for products liability").

■ Plaintiff has not presented evidence showing that the same people owned both Q-tronics and Saline. Indeed, fourteen people owned Q-tronics, of which company Turner and O'Neill, Saline's sole owners, owned only about twenty-two percent. Plaintiff's evidence that Turner and O'Neill possessed a majority shareholder vote and appeared to one witness to be the "domi-

nant" directors cannot prove that they were the sole or even the majority *owners* of Q-tronics. Because the "traditional mere continuation" test focuses on an identity of ownership, Plaintiff cannot show that the exception applies.

Because Plaintiff has not produced evidence capable of showing that any of the exceptions to the general rule that a purchaser of corporate assets is not liable for its predecessor's debts apply, Defendant's motion for summary judgment will be granted.

### C. Spoliation

Plaintiff has filed a "Motion to Determine Spoliation by Defendants and Request for Hearing, if Necessary." Plaintiff, in her complaint, does not state a claim that Saline committed the intentional tort of spoliation, the elements of which were set out by the Ohio Supreme Court in *Smith v. Howard Johnson Co.,* 67 Ohio St.3d 28, 615 N.E.2d 1037, 1038 (1993). Rather, Plaintiff, as she may, asks the Court to impose sanctions on the alleged spoliator. *See Keen v. Hardin Mem'l Hosp.,* 2003 WL 22939453 at *3, 2003 Ohio App. LEXIS 6076, at *7 (Ohio App. Dec. 15, 2003). Specifically, Plaintiff claims that because she has evidence that Saline destroyed Q-tronics records, "the burden shifts to Defendant to prove what those destroyed documents might have shown and how Saline is not a successor to Q-tronics." (Doc. No. 80, p. 6). Plaintiff seeks more than that to which she is entitled.

■ The Ohio Supreme Court has stated that:

> [W]here the destruction of documents has been intentional and for the purpose of depriving the opposing party of evidence, the utmost inference logically possible should favor the party ag-

grieved, and ... the contents of the documents destroyed should be presumed to be what the party aggrieved so alleges them.

*Banks v. Canton Hardware Co.*, 156 Ohio St. 453, 103 N.E.2d 568, 573 (1952) (basing its holding in part on a then-existing Ohio statute). A plaintiff alleging spoliation must show that the defendant "willfully destroyed evidence in an effort to disrupt the plaintiff's case." *Keen*, 2003 WL 22939453 at *3, 2003 Ohio App. LEXIS at *7.

■ Plaintiff has presented no evidence showing that Saline destroyed Q-tronics' documents with the purpose of disrupting her lawsuit, which was filed after the time she alleges the documents were destroyed, or even that Saline destroyed the documents in contemplation that Plaintiff might bring a lawsuit. Moreover, Plaintiff has not stated, beyond the general category of "records," which Q-tronics documents were destroyed or what she claims they would show. Therefore, even if Plaintiff had shown that Saline acted with the requisite intent, the Court would be unable to make any presumptions about the contents of the documents. Plaintiff's motion "to determine spoliation" and request for a hearing is therefore denied.

### D. *Motion to Strike*

Defendant has moved to strike the affidavits of Rick Kain, Amos Place, and Theodore Ralston. Because the Court finds that nothing in those affidavits creates a genuine issue of material fact, Defendant's motion shall be denied as moot.

### CONCLUSION

Based on the foregoing, Plaintiff's Motion for Summary Judgment as to Successor Liability to a Sum Certain (Doc. No. 74) is denied. Defendant's Cross–Motion for Summary Judgment (Doc. No. 75) is granted. Defendant's Motion to Strike Af-

fidavits (Doc. No. 81) is denied as moot. Plaintiff's Motion to Determine Spoliation by Defendant and Request for Hearing (Doc. No. 88) is denied.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons stated in the Memorandum Opinion filed contemporaneously with this entry, IT IS HEREBY ORDERED, ADJUDGED and DECREED that Plaintiff's Motion for Summary Judgment as to Successor Liability to a Sum Certain (Doc. No. 74) is denied.

FURTHER ORDERED that Defendant's Cross–Motion for Summary Judgment (Doc. No. 75) is granted.

FURTHER ORDERED that Defendant's Motion to Strike Affidavits (Doc. No. 81) is denied as moot.

FURTHER ORDERED that Plaintiff's Motion to Determine Spoliation by Defendant and Request for Hearing (Doc. No. 88) is denied.